689 So.2d 503 (1997)
Mark MATHEWS, Individually and on Behalf of His Minor Son, Chad Mathews; and Rebecca Mathews, Plaintiffs-Appellants/Appellees,
v.
Sharon DOUSAY, State Farm Mutual Automobile Insurance Company, National Union Fire Insurance Company, and Metropolitan Property and Casualty Insurance Company, Defendants-Appellants/Appellees.
No. 96-858.
Court of Appeal of Louisiana, Third Circuit.
January 15, 1997.
*506 Jerry Lytel Lavespere, Jr., Jimmy Roy Faircloth, Jr., Alexandria, for Mark Mathews, et al.
Dewitt T. Methvin, Jr., Alexandria, for Sharon Dousay, et al.
Before SAUNDERS, PETERS and GREMILLION, JJ.
PETERS, Judge.
This suit arises out of an automobile accident in which a vehicle being driven by Sharon Dousay struck a vehicle being driven by Mark Mathews. Mr. Mathews filed this personal injury suit, individually and on behalf of his minor son, Chad. His wife, Rebecca Mathews, joined in the suit to recover for her loss of consortium. Several defendants were named, including Sharon Dousay and State Farm Mutual Automobile Insurance Company, the automobile liability insurer of the vehicle Ms. Dousay was driving at the time of the accident.[1] Following a trial on the merits as to the claims against Ms. Dousay and State Farm, the jury returned a verdict finding Ms. Dousay to be 100% at fault in causing the accident and finding that Mr. Mathews did sustain bodily injury as a result of the accident, although the verdict did not specify the type of bodily injury. The jury then awarded Mr. Mathews $35,447.00 for past and future medical expenses; $10,000.00 for past, present, and future physical and mental pain and suffering; and $5,000.00 for loss of enjoyment of life. The jury rejected Mr. Mathews' claim for lost wages and the loss of consortium claims of his wife and son. A judgment was signed in accordance with the jury's verdict.[2] The defendants filed a motion for judgment notwithstanding the *507 verdict or, in the alternative, for a new trial, which motions were denied. The plaintiffs and the defendants appeal.

DISCUSSION OF THE RECORD
The accident occurred on January 4, 1994, and appeared to be minor in nature. At the time of the accident, Mr. Mathews, who worked as a salesman for Hixson Hopkins Autoplex of Alexandria Inc., an automobile dealership in Alexandria, Louisiana, was driving a potential customer trade-in vehicle, when the left front fender of Ms. Dousay's vehicle struck the left rear tire of the vehicle he was driving. Ms. Dousay, who had been stopped at a stop sign, estimated Mr. Mathews' speed to be twenty to twenty-five miles per hour and her speed to be about three miles per hour at the time of impact. Mr. Mathews estimated his speed to be between twenty and thirty miles per hour. Both vehicles sustained minor damage as a result of the accident. In fact, Larry Dousay, Ms. Dousay's husband, testified that he removed the markings on their vehicle with cleaner and a rag and that there were no dents or scrapes.
Mr. Mathews returned to work immediately after the accident. About an hour and a half later, his back began bothering him. A co-employee brought him to the emergency room of a local hospital, where he was diagnosed as having a lumbar contusion or sprain.
In addition to other medical complaints, the plaintiffs contend that this accident caused Mr. Mathews to suffer a cervical disc herniation, and one of the principal issues at trial was causation of that condition. The defendants contend that the accident did not cause that condition and that it was associated with prior accidents.
In fact, Mr. Mathews had been involved in prior accidents. A medical record dated June 5, 1990, and prepared as a result of an automobile accident in which Mr. Mathews had been involved, noted complaints of cervical spine pain, particularly on the right side. Thereafter, on June 12, 1990, while receiving treatment from Dr. Douglas A. Waldman, an Alexandria, Louisiana orthopedic surgeon, in connection with a wrist injury, Mr. Mathews gave Dr. Waldman a history of a neck injury in an automobile accident.[3] However, Dr. Waldman explained that he found no neurological problems as a result of his examination, that Mr. Mathews' X-rays were unremarkable, and that he did not think Mr. Mathews needed any long-term treatment for the condition. In fact, according to Dr. Waldman, the neck complaint was not addressed at any time thereafter and he did not observe any evidence of a herniated cervical disc during his treatment of Mr. Mathews. He eventually released Mr. Mathews to return to full duty as an iron worker, and Mr. Mathews was able to return to iron work. According to Dr. Waldman, it would be nearly impossible for an individual to return to iron work if the individual had a herniated disc in his neck.
After the automobile accident of June 5, 1990, Mr. Mathews was also treated by Dr. Sidney G. Rud, an Alexandria, Louisiana chiropractor. On June 27, 1990, Mr. Mathews presented Dr. Rud with a history of a minor car accident and complaints of neck stiffness on the right. He was treated by Dr. Rud for this complaint on June 29, July 3, and July 23, 1990. However, by July 23, 1990, his neck was much improved.
Mr. Mathews actually began seeing Dr. Rud concerning low back, hip, and knee complaints on May 9, 1989, and saw him a number of times thereafter for those complaints. Less than two months prior to the present accident, on November 10, 1993, Mr. Mathews presented to Dr. Rud with complaints of low back pain. At that time, he gave Dr. Rud a history of having walked across the parking lot at Hixson Hopkins Autoplex and having experienced a sensation in his low back and sharp pain down his right leg. Between November 10 and the date of the accident, Mr. Mathews returned to Dr. Rud a total of eight times, with the last visit being January 3, 1994, the day before the present *508 accident. During most of those visits, his principal complaint was that of low back pain. However, on three occasions, he did complain of stiffness between the shoulders and in the neck. On one occasion, Dr. Rud massaged the muscles in Mr. Mathews' cervical area but did not give him any treatment for the cervical spine. On January 3, 1994, Dr. Rud did not record any complaint of neck pain.
A second chiropractor practicing in Dr. Rud's office, a Dr. Nelson, also treated Mr. Mathews during that time. Mr. Mathews saw Dr. Nelson on December 2 and 17, 1993. On the first visit, Mr. Mathews complained of pain in his low back, pain down his right leg, and pain shooting between his shoulder blades into his neck and down into his right arm. On the second visit, he complained of pain in the low back, mid back, shoulder, arms, and neck. Apparently Dr. Nelson's treatment was limited to the low back.
On December 2, 1993, Mr. Mathews saw Dr. Vanda L. Davidson, an Alexandria, Louisiana orthopedic surgeon, complaining of pain in his back with radiation of the pain into his legs, pain in his arms, and some numbness in his right leg. Dr. Davidson found some muscle spasm on the left side of Mr. Mathews' back and started him on anti-inflammatory medication. The day before the present accident, Mr. Mathews returned to Dr. Davidson with complaints of back pain. Dr. Davidson noted numbness in the right foot and leg and in the shoulder and hand. Also, because of complaints of neck pain, Dr. Davidson examined the neck and noted good range of motion without any evidence of a problem.
Mr. Mathews sought treatment from Dr. Nelson on the three days immediately following the accident. A radiographic test of the cervical spine performed the day after the accident was interpreted as showing no signs of fracture, subluxation, or perivertebral swelling. On January 14, 1994, Mr. Mathews presented Dr. Rud with complaints of low back pain, neck pain, headaches, shoulder pain, and numbness in his right hand. He returned to Dr. Rud on February 7, 1994, with complaints concerning his low back, leg numbness, and neck pain. However, Dr. Rud's treatment was limited to Mr. Mathews' hip area.
On February 10, 1994, Mr. Mathews saw Dr. Louis C. Blanda, a Lafayette, Louisiana orthopedic surgeon, and presented Dr. Blanda with complaints of neck and low back pain. Based on his examination, Dr. Blanda concluded that Mr. Mathews had a full range of motion in his neck and a normal neurological examination. He ordered an MRI of the cervical and lumbar spine. The MRI of the cervical spine revealed a herniated disc at C4-5, slightly offset to the left. When Mr. Mathews returned to see Dr. Blanda on March 3, 1994, the doctor's examination was positive for muscle spasm in the neck and low back areas. However, he concluded that the neurological deficit was so mild that surgery was not mandated at that point. Dr. Blanda did not restrict Mr. Mathews' work activities as he was of the opinion that Mr. Mathews was able to work with minimal difficulty. However, he did start Mr. Mathews on physical therapy with cervical traction. When Mr. Mathews next saw Dr. Blanda on March 29, 1994, the doctor ordered an EMG, particularly on the right arm, to see if there were any signs of nerve compression. The EMG was within normal limits.
Mr. Mathews was next examined by Dr. Thomas S. Whitecloud, a New Orleans, Louisiana orthopedic surgeon. He first saw Dr. Whitecloud on April 15, 1994, at which time Dr. Whitecloud found loss of motion in the cervical spine, some swelling of the hand, marked decreased strength in the right hand, absence of reflex on the right, and decreased strength of the right biceps. Dr. Whitecloud initially recommended more physical therapy. At a follow-up visit on May 9, 1994, Dr. Whitecloud recommended a decrease in Mr. Mathews' work activities from a sixty-five-hour workweek to a forty-hour workweek.
When Mr. Mathews returned to Dr. Whitecloud on July 29, 1994, he was having bilateral arm pain with the continued decreased strength in the right hand. At this point, in light of the bilateral arm pain, the herniation of the C4-5 disc, the ineffectiveness of the physical therapy, and the decreased activities, Dr. Whitecloud recommended surgery. In August of 1994, Mr. Mathews underwent *509 an anterior cervical excision and fusion. As of February 10, 1995, Mr. Mathews was released to return to a forty-hour workweek.
The doctors who testified were generally consistent in their opinions that the herniated disc was caused by the accident of January 4, 1994. Dr. Rud testified that in his opinion, it was probable that Mr. Mathews' neck was injured in the present automobile accident, given that Mr. Mathews had made no neck complaints on the two visits prior to the accident and that, following the accident, Mr. Mathews had reported neck pain and headaches. Dr. Davidson was of the opinion that it was more likely that the accident was the cause of Mr. Mathews' neck problems given the complaints after the accident and given the range of motion Mr. Mathews demonstrated in his office prior to the accident. While Dr. Davidson expressed that Mr. Mathews might have had a herniated disc when he saw him on the day before the accident, he did not think it was significantly symptomatic or that it would have required surgery.
Dr. Blanda was of the opinion that if Mr. Mathews had the same symptoms the day before the January 4, 1994 accident, it would be impossible to credit the disc injury to that accident. However, he was also of the opinion that if Mr. Mathews had prior neck complaints, had some stiffness that was treated conservatively a month before the accident by the chiropractor, was in an automobile accident and was "jerked," and ultimately complained of pain and headaches, the automobile accident aggravated and exacerbated that injury. Dr. Blanda also testified that there is no way of correlating the force of an impact with a disc injury. He explained that a disc injury can occur by coughing, sneezing, or bending down to tie shoes.
Dr. Whitecloud was of the opinion that the accident caused the herniated cervical disc. The fact that Mr Mathews had complained of neck pain in the past was not, in his opinion, evidence of the presence of a cervical disc prior to the January 4, 1994 accident.

OPINION
On appeal, the plaintiffs contend that the trial court abused its discretion in failing to give a requested instruction concerning uncontroverted evidence and in restricting closing argument concerning the absence of the defendants' evidence. Additionally, they contend that the jury abused its discretion in awarding only $15,000.00 in general damages and in failing to award damages for loss of earnings and loss of consortium. Ms. Dousay and State Farm appeal, contending that the trial court erred in awarding Mr. Mathews grossly excessive medical expenses not related to the accident. Fault or negligence in connection with the accident is not at issue on appeal.

Requested Jury Instruction
The plaintiffs requested that the trial court instruct the jury that in evaluating evidence, the trier of fact should accept as true uncontradicted testimony of a witness where the record indicates no sound reason for its rejection. The trial court denied the request, stating:
In this particular case the history of the medical, the income questions as to exactly what was proven and what's not are such that if I were to instruct that the medical testimony of the economist is to be accepted as true, I think that is an improper comment on the evidence directly. Those are the issues exactly at hand, and so I'm electing not to.
The plaintiffs contend that the inconsistency between the amount of special and general damages awarded by the jury demonstrates the harmful result of failing to give the requested instruction.
The trial court must give jury instructions that properly reflect the law applicable to the facts of the particular case. Brown v. Diamond Shamrock, Inc., 95-1172 (La.App. 3 Cir. 3/20/96); 671 So.2d 1049. To fulfill this duty, the trial court must both insure that the jury considers the correct law and, in giving the instructions, avoid confusing the jury. Id. In Iorio v. Grossie, 94-846, pp. 2-3 (La.App. 3 Cir. 10/4/95); 663 So.2d 366, 368-69, this court stated:
A trial court should give all requested instructions that correctly state the law, provided that they are material and relevant *510 to the litigation. Courts are not obligated to give the specific jury instructions submitted by the parties, but omission of a requested instruction containing an essential legal principal [sic] may constitute reversible error. A court has fulfilled its duty if its instructions fairly and reasonably point out the issues presented by the pleadings and evidence and provide the principles of law necessary to resolve those issues.
An appellate court must exercise great restraint before overturning a jury verdict on the basis of erroneous instructions. Consequently, we will overturn the jury's verdict in the case sub judice on the basis of such an error only if the instructions, taken as a whole, were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts. Ultimately, the pertinent inquiry is whether the jury was misled to such an extent as to be prevented from doing justice.
(Citations omitted).
It appears that the trial court was concerned that if it gave the requested instruction, the jury would think it had to accept as true the factual assumptions relied on by the economist in arriving at damage awards. While uncontradicted expert testimony is not binding on the fact finder, such testimony should be accepted as true in the absence of circumstances in the record that cast suspicion on the reliability of that testimony. Arnold v. Town of Ball, 94-972 (La. App. 3 Cir. 2/1/95); 651 So.2d 313. However, the value of the expert's opinion depends on the existence of the facts on which the opinion is predicated. Gardiner v. Commercial Union Ins. Cos., 488 So.2d 1331 (La.App. 3 Cir.1986). In order for an expert opinion to be valid and merit much weight, the facts upon which the opinion is based must be substantiated by the record. Id.
We find that the jury instructions, taken as a whole, were not so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts. The trial court instructed the jury that a witness is presumed by law to speak the truth and that the jury could accept all, some, or none of a witness' testimony. Additionally, the trial court instructed the jury that experts must give reasons for their opinions and that if the jury felt that an expert's opinion were not based on sufficient background, that the expert's reasons were not supported by the facts of the case, or that the expert's opinion were outweighed by other evidence, it could disregard the expert's opinion. While the requested instruction would have been an accurate statement of the law in light of the other instructions actually given to the jury on expert testimony, we do not find that the jury was misled to such an extent as to be prevented from doing justice.

Closing Argument
The plaintiffs contend that the trial court erred by restricting their closing argument concerning the defendants' failure to call medical witnesses on the issue of causation. The defendants took the depositions of Drs. Davidson, Rud, and Waldman, but the depositions were introduced at trial as plaintiffs' exhibits. The medical evidence that the defendants introduced included medical records that predated the accident, emergency room records dated the day of the accident, and radiology results dated the day after the accident. The following colloquy occurred during the trial:
BY [PLAINTIFFS' ATTORNEY]:
It's my understanding that Your Honor has instructed that I cannot argue to the jury that State Farm has failed to call any medical witnesses to testify that the automobile accident did not cause the herniated disc suffered by my client.
BY THE COURT:
But my ruling isn't that ... it's to what they can say. I'm not ruling that he can't... I mean, I'm not making a call as to causation and the rest of it. What I'm ruling is that if [the defendants' attorney] noticed for trial depositions your doctors and you're gonna use the depositions that he noticed for trial purposes, I think it's improper argument to say that he called no medical testimony whatever it says. The contents of it you can argue all day long. I'm not gonna limit you on the ... *511 what you think it shows in closing argument. I just don't think the procedure is proper to say he has failed to call any when in effect he noticed trial depositions that you are using as trial depositions to proceed. And I don't think that the jury needs to be contending with expert testimony as to who calls it. I don't think it's a proper inference to come back and say that [sic] haven't called any, when in fact they did call for testimony witnesses you had scheduled.
BY [PLAINTIFFS' ATTORNEY]:
Your Honor, if I steer away from the words "call" and "offer," will I be okay. I mean if I say that, you know, no doctors testified to this, you know.
BY THE COURT:
That's fair argument. No doctors testified [sic] the lack of causation. That's all proper. What I don't like is the fact that you're trying to draw an inference that they couldn't find anybody because they didn't go get their own doctor. That has some probative value. They used your doctor.
BY [PLAINTIFFS' ATTORNEY]:
Is that an improper inference, Your Honor, in closing argument? I thought that was an appropriate inference that I could drawthe lack of evidence.
BY THE COURT:
When he ... you can call a lack of evidence but you can't say he refused to call a witness `cause he did call a witness. He called your doctors, and that's the point that I'm making. I don't think that it's proper. You can argue all day long as to what that evidence shows. My point is, and I don't care how you word it, if it comes across the situation of saying the defendants are bad guys because they wouldn't call any witnesses, that's not true. They chose to attempt to throw your witnesses back on you. And if they call those, they called it. Had he not, well, then it would be a situation of laying [sic] back and doing nothing. But I don't think this jury needs to make determinations as to who noticed depositions and who called and the restargue what's in the deposition.
The trial court has great discretion in regulating and controlling closing argument, within proper bounds, to a jury. Guidry v. Boston Old Colony Ins. Co., 540 So.2d 543 (La.App. 3 Cir.), writ denied, 543 So.2d 7 (La.1989). The trial court's rulings in this regard will not be reversed unless they constitute an abuse of the court's much discretion. Id.
In the instant case, even assuming that the trial court improperly restricted the plaintiffs' closing argument, any such error was harmless. The jury did find causation, the very issue on which the plaintiffs sought to argue the defendants' failure to present medical testimony. Additionally, in closing argument, although the plaintiffs' attorney did not state that the defendants failed to present medical testimony on the issue of causation, he did state the following:
There is no evidence before you in the record, no good evidence to tell you that the automobile accident did not cause my client's cervical disk herniation.... He did not have a cervical disk herniation prior to this accident, and not one of those four orthopaedic surgeons told you he did. Not even the two, Dr. Davidson and Dr. Waldman, who treated him prior to the accident.
Since the plaintiffs' attorney argued the lack of evidence contradicting the claim of causation of the cervical disc herniation and since the jury obviously found causation, the trial court's restriction of the plaintiffs' closing argument, if error, was harmless.

General Damages
The jury awarded Mr. Mathews $10,000.00 for past, present, and future physical and mental pain and suffering and $5,000.00 for loss of enjoyment of life. The plaintiffs contend that Mr. Mathews is entitled to an increase in the award of general damages.
In Andrus v. State Farm Mutual Automobile Insurance Co., 95-0801, p. 8 (La.3/22/96); 670 So.2d 1206, 1210, the supreme court stated:

*512 In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Only if the reviewing court determines that the trial court has abused its "much discretion" may it refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion.
Because discretion vested in the trial court is "great," and even vast, an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
(Citations omitted).
The jury verdict form reveals that the jury specifically found that the automobile accident caused bodily injury to Mr. Mathews. Although the jury did not specify the type of injuries caused by the accident, it is obvious that the jury found that the cervical disc herniation and the aggravation of the back condition were caused by the accident. This is so because the evidence of injury presented at trial focused on those conditions and the jury awarded medical expenses in that regard. Additionally, all of the medical testimony indicated that the automobile accident caused or aggravated the cervical disc condition.
Mr. Mathews, thirty-five years old at the time of trial, testified that the first week or so after the accident he was having "real, real bad" problems with his neck and mid back, including "knots," stiffness, and soreness. According to Mr. Mathews, it felt like a "hot poker jabbed into your neck." He participated in physical therapy three times a week for eight and one-half months. Additionally, he continued to work when he could but needed medication "just to keep going." He experienced decreased grip strength and swelling in his hand, loss of motion in the cervical spine, and decreased biceps strength on the right. Eventually, he experienced bilateral arm pain.
Some eight months after the accident, Mr. Mathews underwent an anterior cervical excision and fusion, and he remained in the hospital two or three days. Mr. Mathews testified that during the first week after his release from the hospital, he slept in his Lazy Boy because he could not sleep in bed. He wore a hard collar around his neck for three to four months and a soft collar for another three months. He tried to return to work at Hixson Hopkins Autoplex but had to quit because he was unable to work a sixty-eight-hour workweek. He testified that he is still having some difficulties during his workday with his new employer, Bancroft.
According to Mr. Mathews, he can no longer water-ski, snow ski, or engage in activities that have the potential for contact because he is afraid that something else will happen. He testified he cannot stay on his feet for hours at a time without hurting. Dr. Whitecloud assigned him a ten percent permanent impairment rating of his body because of the disc herniation.
We find that under the facts of this case, the jury abused its discretion in its award of general damages. Thus, we may refer to similar cases to determine the lowest award within the jury's discretion.
In Andrus, the plaintiff was involved in a rear-end collision in which she sustained a compression fracture of the thoracic vertebra and a TMJ injury, both of which were resolved within five or six months after the accident, although they were initially very painful. However, she also sustained a herniated cervical disc. The injury to her cervical spine also apparently aggravated her preexisting but nonsymptomatic spondylosis and caused a nerve-root fracture. The cervical injury worsened, and a surgical fusion was performed. The fusion was successful and achieved an excellent recovery, although the plaintiff experienced a subsequent flareup. *513 The cervical injury left the plaintiff with permanent limitations in lifting, stooping, and other physical activities. The supreme court in Andrus found that the jury's award of $15,000.00 for past and future physical pain and suffering was an abuse of discretion and fixed the award at $75,000.00.
In Farque v. McKinney, 576 So.2d 1191 (La.App. 3 Cir.), writ denied, 580 So.2d 387 (La.1991), the plaintiff sustained injuries in an automobile accident. The plaintiff underwent an anterior cervical discectomy involving two disc levels. Fragments were removed from the spinal canal related to a soft disc injury at C5-6 and spurring was removed at C6-7. Prior to the surgery, the plaintiff had experienced significant pain caused by nerve root irritation. For several months thereafter, he was disabled and in discomfort. He was assigned ten percent total disability and twenty percent permanent partial disability to his neck. This court of appeal raised the jury's award of $10,000.00 for pain and suffering to $60,000.00.
We find that Andrus and Farque, although presenting more severe cases, are comparable to the case at hand. Under the facts of the instant case, we find that the lowest amount the jury could have awarded for past, present, and future physical and mental pain and suffering is $50,000.00.
However, although we might have awarded a higher amount for loss of enjoyment of life, we find no abuse of the jury's discretion in awarding $5,000.00. In Andrus, the supreme court affirmed an award of $10,000.00 for past and future mental pain and suffering, loss of physical function, and loss of capacity for enjoyment of life. Given the differences in the two cases, we conclude that $5,000.00 would be the lowest amount the jury could have awarded for loss of enjoyment of life.

Past and Future Loss of Earnings
Mr. Mathews contends that the trial court erred in failing to award him past and future loss of earnings. He does not claim loss of earnings from the time of the accident until his surgery since he continued to work during that period of time when he could. Rather, he contends that he is entitled to this item of damages during the period of recovery following the surgery and for any diminished future earnings.
To recover for actual wage loss, a plaintiff must prove the length of time missed from work due to the tort and must prove past lost earnings. Craven v. Universal Life Ins. Co., 95-1168 (La.App. 3 Cir. 3/6/96); 670 So.2d 1358, writ denied, 96-1332 (La.9/27/96); 679 So.2d 1355. Past lost earnings are susceptible of mathematical calculation from evidence offered at trial. Id. An award for past lost earnings requires evidence as reasonably establishes the claim, which may consist of the plaintiff's own testimony. Id. An award for past lost earnings is not subject to the much-discretion rule when it is susceptible of mathematical calculation from documentary proof. Mormon v. Stine, Inc., 95-615 (La.App. 3 Cir. 11/2/95); 664 So.2d 600. The plaintiff's uncorroborated, self-serving testimony will not be sufficient to support an award if it is shown that corroborative evidence was available and was not produced. Id. To obtain an award for future loss of earning capacity, a plaintiff must present medical evidence that indicates with reasonable certainty that a residual disability causally related to the accident exists. Perritt v. Commercial Union Ins. Co., 95-1274 (La.App. 3 Cir. 3/13/96); 673 So.2d 215, writ denied, 96-1751 (La.10/11/96); 680 So.2d 644. Future loss of earnings, which are inherently speculative, must be proven with a reasonable degree of certainty, and purely conjectural or uncertain future loss of earnings will not be allowed. Id.
In August of 1994, Mr. Mathews underwent an anterior cervical excision and fusion. Following the surgery, Dr. Whitecloud did not release Mr. Mathews to return to work until February 10, 1995, and there is no evidence that the surgery was unnecessary or that Mr. Mathews was able to or did work during that period of time. When Dr. Whitecloud did release Mr. Mathews to return to work, he released him to return to a forty-hour workweek. Mr. Mathews described a sixty-eight-hour workweek for the car business, and his supervisor, Lee Murphy, testified that the job was basically *514 ten to twelve hours a day. According to Mr. Mathews, after he was released to return to work, he worked for Hixson Hopkins Autoplex for eleven days but had to quit his job because he could not tolerate the pain. Mr. Murphy explained that when Mr. Mathews attempted to return to work, Mr. Murphy and his supervisor discussed with Mr. Mathews that it was a full-time job and that he had to be there. Mr. Murphy testified that he knew from the second day Mr. Mathews returned to work that he was not going to make it, "[j]ust because of having to pound the pavement and the second day he was there he was hurting."
Mr. Mathews was paid on a commission basis at Hixson Hopkins Autoplex, and according to him, he averaged $5,000.00 a month. A 1993 W-2 form introduced into evidence revealed a gross income of $15,508.43 with Hixson Hopkins Autoplex. However, Mr. Mathews testified that he did not start working there until September 10, 1993. That would average out to roughly $4,000.00 per month. After he left Hixson Hopkins Autoplex, he was unemployed another six to eight weeks before obtaining employment with his current employer, Bancroft, as an outside sales representative. He testified he now works thirty or forty hours a week and averages $2,300.00 a month.
Dr. Jan Duggar, the plaintiffs' expert in the field of economics, calculated past loss of earnings of $58,000.00, without fringe benefits, for the period from the date of the surgery to the date of trial[4] and future loss of earnings of $628,641.00, without fringe benefits, based on the differential between $5,000.00 a month and $2,300.00 a month.[5] The defendants offered no expert testimony on the issue.
In light of the foregoing evidence, we find that the jury was clearly wrong in not awarding Mr. Mathews past lost earnings. Surgery was performed in August 1994, and he was not released by Dr. Whitecloud until February 1995. Even then, the release was conditioned upon him limiting his employment to forty hours per week instead of the sixty-eight hours he had been working prior to the accident. He was required to accept a lower paying job because of the reduction in hours and was still working at that position at trial. Mr. Mathews' loss can be mathematically calculated for that period. Based on the 1993 W-2 form, we find that Mr. Mathews was making $4,000.00 per month at Hixson Hopkins Autoplex and $2,300.00 per month at Bancroft. Thus, he lost $4,000.00 per month from August 1994 until February 1995 and $1,700.00 per month thereafter until trial. We find the total loss to be $40,400.00.
While we might have reached a different conclusion, we find no error in the jury's decision to deny recovery for loss of future earnings. Although Mr. Mathews suffers a permanent ten percent disability of the body and initially suffered a decrease in income based on forty hours per week, that decrease is proportional to what he would have received working forty hours per week at Hixson Hopkins Autoplex. That is to say, had he reduced his hours at Hixson Hopkins Autoplex to forty hours per week, he would have been making basically that which he is making with Bancroft. The jury could have reasonably concluded that he would not have worked sixty-eight hours per week for the rest of his work-life expectancy.

Loss of Consortium
The plaintiffs contend that the trial court abused its discretion in failing to award damages for the loss of consortium claims of Ms. Mathews and Chad Mathews. Evidence at trial on the issue included testimony that prior to the surgery Ms. Mathews helped Mr. Mathews with his therapies almost daily, which included massaging his neck and back; that Ms. Mathews took care of her husband after the surgery, including giving him sponge baths; that Ms. Mathews did the yard and household work, which Mr. Mathews was unable to do; and that Mr. Mathews was unable to pick his son up and do "daddy things," such as playing ball.
*515 The compensable elements of damage in a claim for loss of consortium include loss of society, sex, service, and support. Lonthier v. Northwest Ins. Co., 497 So.2d 774 (La.App. 3 Cir.1986).
"Society" is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which presumably will, as a result of the injury, have to be obtained from another source and at a price.
Id. at 776.
As with general damage awards, the trier of fact is given much discretion in its deliberations concerning awards for loss of consortium. Doucet v. Doug Ashy Bldg. Materials, Inc., 95-1159 (La.App. 3 Cir. 4/3/96); 671 So.2d 1148. Whether a party is entitled to loss of consortium damages is a question of fact, and a finding of fact cannot be overturned on appeal absent manifest error. Lonthier, 497 So.2d 774.
Neither Mr. nor Ms. Mathews testified concerning any impact that Mr. Mathews' injuries had on the couple's marital relations or that Ms. Mathews lost any love, companionship, or affection as a result of Mr. Mathews' injuries. The parties did testify that Mr. Mathews became irritable. However, "while `every personal injury tends to decrease the parties' overall happiness', it is the plaintiff who carries the burden of proving a definite loss on each element of damages." Id. at 776 [quoting Finley v. Bass, 478 So.2d 608, 614 (La.App. 2 Cir.1985)]. We do not find that the jury was clearly wrong in failing to find that Ms. Mathews suffered a loss of society or sexual relations as a result of the accident.
Additionally, while Mr. Mathews testified that he could not pick up his three-son and do "daddy things," we do not find that the jury was clearly wrong in failing to make an award for loss of consortium to Chad Mathews. The jury could have concluded that the plaintiffs failed to prove any loss to Chad in this regard.
Concerning the element of loss of services, Ms. Mathews testified that her husband was unable to do yard work and help around the house during the eight-month period between the time of the accident and the time of the surgery and that she had to do those things. Jurisprudence has recognized the detrimental effect on a marital relationship from one spouse's inability to perform household services and has considered this factor in awarding damages for loss of consortium, even in the absence of pecuniary loss. Andrus v. Board, 626 So.2d 1224 (La.App. 3 Cir.1993). Thus, an award for loss of consortium for this element would have been proper under the facts of this case. However, we must review the denial of the award under the manifest error standard.
In Andrus, 95-0801; 670 So.2d 1206, a husband sought damages for loss of consortium. The husband was a surveyor who was frequently away from home. He testified about his wife's depression, fear of paralysis, inability to do housework, inability to pursue her hobbies, and inability to engage in sexual relations. Additionally, he and his two married daughters were doing the housework, caring for the two children still at home, and doing all of the gardening. Despite this evidence, the supreme court was unable to say that a jury was clearly wrong in rejecting the plaintiffs' evidence as to the loss of consortium claim.
Likewise, while we might have decided the issue in favor of Ms. Mathews and Chad, we do not find that the jury in the instant case was clearly wrong in failing to make such an award. Thus, following the Louisiana Supreme Court's guidance, we affirm the rejection of the claim for loss of consortium. But see Kilpatrick v. Alliance Cas. & Reinsurance Co., 95-17 (La.App. 3 Cir. 7/5/95); 663 So.2d 62, writ denied 95-2018 (La.11/17/95); 664 So.2d 406; Segura v. State Farm Ins. Co., 94-1428 (La.App. 3 Cir. 5/31/95); 657 So.2d 1047.

Medical Expenses
The parties introduced into evidence a joint stipulation as to the accuracy and authenticity *516 of medical expenses in the amount of $35,447.21 incurred by Mr. Mathews after the accident for neck and back complaints. The stipulation expressly provided that it did not constitute an admission as to the causation of Mr. Mathews' injuries or as to whether any medical expenses were due as a result of injuries caused by the accident. The jury awarded Mr. Mathews $35,447.00.
The defendants contend that the award of medical expenses was grossly excessive and not related to the accident. The defendants assert that it is obvious from the jury verdict that the jury found that Mr. Mathews was not substantially injured in the automobile accident of January 4, 1994, and that the subsequent cervical surgery was not related to the accident. The defendants also assert that the only reasonable conclusion that can be reached from the jury's verdict is that the jury felt that it must award the stipulated medical expenses, even though they were not related to the automobile accident. The defendants argue that
[s]ince the stipulation and evidence in the record clearly show that at least $28,205.08 of the medical expenses were related to the diagnosing of the herniated cervical disc and the operation, a reasonable and fair minded jury could have awarded no more than $7,272.00 in medical expenses which might have been related to the accident.
As we appreciate the defendants' argument, they do not contend that if the accident caused the herniated cervical disc, the amount stipulated would be the correct amount. Rather, it is the defendants' position that the January 4, 1994 accident did not cause the cervical disc herniation.
Without more, we are unwilling to attribute to the jury that it disregarded or did not understand the stipulation before it that expressly stated that the stipulation did not constitute an admission as to causation or an admission as to whether any medical expenses were due. The jury obviously found causation, and the medical testimony is not even close on the issue. In light of the medical testimony, we find no manifest error in the jury's finding of causation of the disc herniation. Thus, we affirm the award of medical expenses.

DISPOSITION
For the foregoing reasons, we amend the judgment to correct the clerical error as to the amount of medicals and recognize the jury's award of $35,447.00. We also amend the judgment to increase the award for past, present, and future physical and mental pain and suffering to $50,000.00. We reverse the failure to award past loss of earnings and fix that award at $40,400.00. We affirm the judgment in all other respects. We assess costs of this appeal to the defendants.
REVERSED IN PART AND RENDERED; AFFIRMED IN PART AS AMENDED.
NOTES
[1] The plaintiffs also filed suit against Ms. Dousay's husband, Larry Dousay; National Union Fire Insurance Company, an insurer for Hixson Hopkins Autoplex of Alexandria Inc., Mr. Mathews' employer; and Metropolitan Property and Casualty Insurance Company, Mr. Mathews' UM carrier. The record reveals that on joint motion of counsel for National Union Fire Insurance Company and the plaintiffs, a judgment of partial dismissal was entered dismissing National Union Fire Insurance Company without prejudice. Mr. Dousay filed a peremptory exception of no cause of action, but the record does not reveal the disposition, if any, of that matter. Additionally, the petition does not reveal that the plaintiffs requested service on Metropolitan Property and Casualty Insurance Company, and the record does not reveal that this insurer made an appearance.
[2] We note that on the jury verdict form, the jury awarded past and future medical expenses in the amount of $35,447.00. However, the judgment lists the award at $35,477.00. This is obviously a typographical error, and we will amend the judgment to reflect the correct amount for this item of damages.
[3] Dr. Waldman had been following Mr. Mathews for different conditions since February of 1987. These conditions included a hand injury, low back injuries, a hip and leg injury, and a wrist injury.
[4] Trial was held on October 24 and 25, 1995.
[5] Dr. Duggar also made calculations with fringe benefits based on information provided to him, but that information is not of record.