STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-678


JENELLA E. BEN AND RICKIE HAIRSTON

VERSUS

BALDWIN & LYONS, INC., ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20124604
HONORABLE JULES D. EDWARDS, III, DISTRICT JUDGE


**********

**SHANNON J. GREMILLION**
**JUDGE**

**********


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and John E. Conery, Judges.

THIBODEAUX, Chief Judge, concurring and assigning reasons.


**AFFIRMED.**

**Richard D. Chappuis, Jr.**
**Beau A. LeBlanc**
**Voorhies & Labbe**
**700 St. John Street, Fifth Floor**
**P.O. Box 3527**
**Lafayette, LA 70502**
**(337) 232-9700**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Baldwin & Lyons, Inc.**
    **Oakley Trucking, Inc.**
    **Shermain Montiel Vaughn**

**J. Kirk Piccione**
**Brenda S. Piccione**
**Piccione & Piccione**
**2701 Johnson Street, Suite 301**
**P.O. Box 3029**
**Lafayette, LA 70502**
**(337) 233-9030**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Rickie Hairston**

**GREMILLION, Judge.**

Defendants appeal the trial court's judgment awarding plaintiff, Rickie Hairston, $195,000 in general damages and $60,683.93 in special damages for injuries sustained in a motor vehicle accident. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts in this matter are not in dispute. Defendant, Shermain Montiel Vaughn, was driving a semi truck for his employer, Oakley Trucking, Inc., who was insured by Baldwin & Lyons, Inc. In March 2012, Vaughn collided with the left front panel of Jenella E. Ben's vehicle while attempting to make a left turn onto West Willow Street from North University Avenue in Lafayette, Louisiana. Hairston was a passenger in Ben's vehicle. Defendants stipulated that Vaughn was 100% percent at fault in causing the accident and that he was in the course and scope of his employment at the time.

Hairston filed a petition for damages in August 2012. Following a trial in April 2017, the trial court rendered judgment finding that Hairston proved the subject accident caused him the following injuries:

1) Cervical pain with radiculopathy and spasm

2) Irritated nerves in the right arm

3) Left sacroiliac joint pain

4) Non-specific upper extremity paresthesias

5) Subluxating Patella and Torn Meniscus of the left knee, which was surgically repaired by Dr. Blanda.

6) Posttraumatic headaches, and head trauma Lumbar [sic] pain on [sic] with some muscle spasms.

The trial court awarded Hairston $195,000 in general damages and $60,683.93 in special damages, $240 of which was for lost wages. Defendants now appeal.

3

## ASSIGNMENTS OF ERROR

1. The Trial Court erred in awarding Plaintiff Hairston an amount for lost wages when no concrete evidence was introduced at trial proving with any specificity an amount of wages which Plaintiff lost as a result of this accident.

2. The Trial Court Erred [sic] in failing to discredit the testimony of Plaintiff Hairston after his testimony was impeached at trial.

3. The Trial Court erred in giving greater weight to the testimony of Dr. Bozzelle concerning Plaintiff's neck and back injuries allegedly sustained in the accident, when both Drs. Butaud and Blanda contradicted Dr. Bozzelle's testimony concerning Plaintiff's alleged neck and back injuries.

4. The Trial Court erred in giving greater weight to the testimony of Dr. Blanda concerning Plaintiff's alleged knee injury than it gave to the testimony of Dr. Butaud, who was more qualified to opine on Plaintiff's condition, and who had the benefit of reviewing additional, indispensable medical records which Dr. Blanda did not consider.

5. The Trial Court erred in awarding general damages in excess of the highest reasonable amount that could be awarded for the injuries he allegedly sustained in the accident sued upon.

## DISCUSSION

*Manifest Error*

The supreme court recently summarized the manifest error standard of review:

This court has announced a two-part test for the reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). *See Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. *See id.* The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *See id.*

*Lobell v. Rosenberg*, 15–247, p.10 (La. 10/14/15), 186 So.3d 83, 90.

## ASSIGNMENTS OF ERROR NUMBERS TWO, THREE, AND FOUR

*Liability-Causation*

Although defendants' second assignment of error refers to credibility determinations, the crux of this argument is that the subject accident was not the cause

of Hairston's injuries. Elemental to any negligence claim is causation. The determination of whether defendants' conduct was a cause-in-fact of the plaintiff's injuries is also a question of fact subject to the manifest error review. *Rando v. Anco Insulations, Inc.,* 08-1163, 08-1169 (La. 5/22/09), 16 So.3d 1065. A trial court is in a better position to make credibility determinations, as it has the benefit of examining the nuances of a witness's testimony and demeanor. *Lopez v. Lopez*, 00-660 (La.App. 3 Cir. 11/2/00), 772 So.2d 364. Because a finding of no causation would moot the damages issue, we address this assignment of error first.

Defendants claim that Hairston injured his knee after jumping out of a bunk bed in 2010 and failed to treat the injuries then and, thereafter, to report the previous injury to his current doctors. Defendants argue that Hairston's testimony is not credible because he admitted that he did not tell the current doctors of his previous injury. In brief, defendants state: "The evidence is clear that the March 2012 accident forming the basis of the instant suit did not cause those [knee] injuries. . . . Dr. Blanda's opinion that the March 2012 accident caused Plaintiff's knee injuries and necessitated his knee surgery is clearly wrong[.]"

The following is a summary of the testimony elicited at trial or via deposition. Ben testified that she picked Hairston up from the airport in New Orleans the day before the accident and that he moved in with her. She said they had dated for 5 years before the accident and that Hairston was the father of her two youngest children. Ben said that, prior to the accident, Hairston played basketball and played with their one year old on the floor. She said when Hairston was moving in, he was able to lift heavy items like furniture. Ben testified that they moved two times following the accident and that Hairston was unable to lift anything. She said she had to call her brothers to help.

Following Hairston's knee surgery a year before trial in April 2016, Ben said that Hairston required assistance that she could not provide because she herself had surgery, so Hairston's brother had to come from Pennsylvania to assist him in bathing, dressing,

and using the bathroom. Ben described Hairston as a sports fan who loved to play football and basketball, which he still could not do at the time of trial.

Ben admitted on cross-examination that Hairston returned to work as a cook at Our Lady of Lourdes Medical Center within one month of the surgery and has worked continuously since then. She further admitted that Hairston worked as a painter and carpenter from the time he moved back to Louisiana until at least May 28, 2013, when defense counsel took his deposition.

Hairston testified that he works forty hours a week as a cook making $11.49 per hour. He testified about the moving activities that occurred the day before the accident, including moving furniture and TVs, and walking up and down stairs. He said he had no problems doing any of this activity, or with his neck, back, or knee prior to this accident.

Hairston testified that following the accident, he had intensification of previously existing headaches, neck pain lasting about four months, and he still occasionally has back pain he did not experience prior to the accident. However, Hairston said, "I don't even think death would cause me to miss work," because he has to support his family. Thus, he said he works even if it hurts.

Hairston then reviewed his work history beginning with a job as a painter for "Mr. Johnny" approximately three months after the accident. Hairston said that his boss knew his limitations from the accident. Hairston said he made around $80 a day working as a painter and usually worked about three days per week. He said once he started working for Mr. Johnny he missed about 5 days of work due to his knee injury.

Hairston discussed a May 2010 incident in Pennsylvania in which he jumped out of a bunk bed and landed on his knee. He said that he did go to the emergency room where he had an X-ray. Hairston testified that his knee was swollen and painful from the knee sprain and that it lasted about four weeks. He wore a knee brace and used an ice pack but had no other medical treatment for his knee injury at the time. Hairston

6

said that his knee was back to "100%" in about four weeks. He did not seek any other medical treatment for his knee because it posed no further issues for him, and he was able to resume his normal habits and work doing interior finishing, which included hanging sheetrock and painting.

Hairston described his knee pain following the March 2012 accident. He said his knee would slip in and out of place and was painful. He said even after surgery it continued to be painful. Hairston testified that he is much less active now and cannot engage in any sporting activities like he used to. Hairston said he used to play basketball all the time before the accident but is no longer able to because of the pain and because he is afraid of reinjuring his knee.

On cross-examination, Hairston said he returned to work as a cook one month after his surgery and has never taken a day off of work since then. Opposing counsel extensively reviewed Hairston's employment application with Our Lady of Lourdes for his cook position in which he did not report that he had any limitations, but he did report that he had pain in his knee. Next, Hairston was questioned about the 2010 Pennsylvania incident.

Dr. Joseph R. Bozzelle, an expert in physical medicine and rehabilitation, testified that he first saw Hairston three days after the accident. Hairston complained of headaches, neck pain, left arm and hand pain, left-side mid-back pain, lower back pain, hip, leg pain, and knee pain. Dr. Bozzelle opined that the injuries suffered were related to the March 2012 accident. He stated that Hairston informed him of the 2010 Pennsylvania incident, but that Hairston claimed not to have any ongoing medical treatment at that time because his knee caused him no further problems. Dr. Bozzelle described the various tests conducted over time in relation to Hairston's complaints of headaches and pain. Dr. Bozzelle noted Hairston's lateral patellar subluxation (kneecap not staying properly aligned). Results from an MRI of the knee taken in the fall of 2012

indicated a meniscal tear, tendinosis, tearing of the patellar tendon, and of the chondromalacia patella. In June 2013, Dr. Bozzelle referred Hairston to Dr. Blanda.

Dr. Louis C. Blanda, an orthopaedic surgeon, testified via deposition that he first saw Hairston in October 2013, at which time Hairston complained of neck, lower back, and left knee pain. Dr. Blanda said the neck and low back pain resolved over time but he had lingering problems with his knee. Dr. Blanda testified that Hairston reported the knee injury from the 2010 Pennsylvania incident but claimed he had not had any problems between then and the March 2012 accident. Dr. Blanda recommended surgery after conservative treatment to stop Hairston's knee from slipping out of place (realignment of his patellofemoral mechanism) and to see if he had a meniscal tear. Dr. Blanda reviewed Hairston's medical records from Pennsylvania, which indicated that Hairston had a sprained knee. Dr. Blanda opined that Hairston's subluxating patella was caused by an acute injury, more probably than not resulting from the March 2012 accident.

Dr. Blanda next saw Hairston in March 2014, and again in July 2014. Dr. Blanda continued to recommend surgery but noted that Hairston was afraid to take any time off from work. Dr. Blanda noted that Hairston's patella continued to subluxate and that he had a positive McMurray's test, which indicates a meniscal tear. Hairston returned to Dr. Blanda's office in February and July 2015. He continued to show objective signs of a meniscal tear and patellar subluxation. He continued to wear a knee brace and take pain medication as needed.

Dr. Blanda performed outpatient arthroscopic surgery on April 11, 2016, during which he removed a bucket handle tear (a type of meniscal tear) and realigned the patella mechanism. Dr. Blanda said that following a surgery of this kind a patient is usually able to ambulate well in about three months, with maximum medical improvement within a year.

Dr. Blanda stated:

> Q. And again, the overall need for this surgery, based on the history and everything that you have and the complaints from the patient, you would relate this to the accident of March 2012?
>
> A. Well, the need for the surgery, yeah. I think there may have been some pre-existing issues with his patellofemoral mechanism. Some of it could have been congenital and – which often happens, but trauma is usually the thing that can make it symptomatic enough where it needs surgery. And I think that this trauma is what actually was the icing on the cake. And, you know, you have to add in the fact that he had that meniscal tear too, and that it, by itself, would have required surgery without the patellofemoral problem.

Dr. Blanda released Hairston to return to work on May 26, 2016, with no strenuous activity. In periodic follow up appointments, Hairston continued to exhibit improvements in his symptoms and the functioning of his knee with occasional pain which, Dr. Blanda testified, would not be unexpected following this type of surgery. He rated Hairston's knee impairment at 20%, meaning that his knee was functionally twenty percent worse than another person of the same age without injury to their knee.

Dr. Thomas Butaud, an orthopaedic surgeon, performed an independent medical examination of Hairston in November 2014. Regarding his knee, Dr. Butaud reported that Hairston told him of a previous knee injury that had improved but did not tell him that he jumped out of a bunk bed, had mild to moderate swelling, had an 8 out of 10 pain level, or that the emergency personnel gave him a knee splint.

Dr. Butaud completed an addendum after reviewing the x-ray records from the 2010 ER visit and concluded:

> [H]e had what's called a patella alta, and what that basically told me was that there was injury to the patellar tendon that inserts on the inferior pole or the bottom part of the kneecap and inserts into the tibia, meaning that there was a high-riding patella.

Dr. Butaud said that an MRI in 2010 would have been indicated to determine the pathology and then a repair of the tendon tear would follow. Dr. Butaud opined that in the 2012 accident, Hairston re-injured his left knee patellar tendon injury, which should have been operated on "back then." Based on various calculations using the X-ray

images obtained from the Pennsylvania hospital, Dr. Butaud opined that there was a patellar tendon injury in 2010. Dr. Butaud was of the opinion that the 2012 knee injury exacerbated the pre-existing knee injury in 2010.

Although defense counsel went to great pains to show that Hairston was hiding the 2010 Pennsylvania incident and that the injury to his knee was rooted in that incident, reasonable people could easily find that not to be the case. Hairston himself testified regarding the 2010 incident and stated that, after a month, he was able to resume his normal activities. Dr. Blanda knew of the incident and did not feel it was significant in terms of the acute injury that occurred in this accident. It is true that Dr. Blanda did not have the benefit of the 2010 X-rays that Dr. Butaud had access to. Dr. Butaud could not determine whether the previous tear was medial or lateral; only that the Pennsylvania X-rays showed a positive McMurray's test.

Furthermore, even if there was an aggravation or exacerbation of a pre-existing injury, it is classic hornbook law that you take the plaintiff as you find them:

> [t]he defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant. It is clear that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. . . . When the defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation.

*Lasha v. Olin Corp.*, 625 So.2d 1002, 1005-06 (La.1993) (citations omitted).

The plaintiff bears the burden of proving a causal connection between the subject accident and the aggravation of his pre-existing injury. *Bienemann v. State Farm Mut. Auto. Ins. Co.*, 08-1045 (La.App. 3 Cir. 2/4/09), 3 So.3d 621. The trial court found Hairston's testimony that he had no lingering issues with his knee following the 2010 incident to be credible. The trial court further found credible Hairston and Dr. Blanda's testimony that the 2012 accident caused a serious change in the proper function of Hairston's knee resulting in a change of lifestyle and ongoing issues. Regardless of whether the 2012 accident caused an aggravation and/or exacerbation of a pre-existing

injury, the trial court had a reasonable basis for its finding. Furthermore, contrary to the defendants' assertions, Hairston did not conceal the fact that he had injured his knee before the 2012 accident. Accordingly, we find the trial court did not err in finding that the March 2012 accident was the legal cause of the injuries to Hairston's knee requiring surgery. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER ONE

### Damages-Lost Wages

Special damages are those damages that may be determined with some degree of certainty and include past and future medical expenses and past and future lost wages. *Wainwright v. Fontenot,* 00-492 (La. 10/17/00), 774 So.2d 70. The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence. *Cormier v. Colston,* 05-507 (La.App. 3 Cir. 12/30/05), 918 So.2d 541.

Defendants contend the trial court erred in awarding Hairston $240 in lost wages because Hairston did not meet his burden of proof at trial and no reasonable fact finder could hold otherwise. We disagree. A plaintiff's own reasonable testimony is sufficient to prove a lost wages claim. *See Driscoll v. Stucker*, 04-589 (La. 1/19/05), 893 So.2d 32; *Wendel v. Travelers Ins. Co.*, 14-02 (La.App. 4 Cir. 10/8/14), 151 So.3d 828, *writ denied*, 14-2346 (La. 2/6/15), 158 So.3d 818; and *Mathews v. Dousay*, 96-858 (La.App. 3 Cir. 1/15/97), 689 So.2d 503.

Hairston testified that he missed between two and five days of work as a painter at which he earned $80 per day cash. Under the circumstances of this particular case, we find the trial court's award of $240 in lost wages was not manifestly erroneous. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR FIVE

Alternatively, defendants argue that even if causation is proven, the trial court erred in awarding general damages which "grossly exceed" the highest reasonable amount Hairston may be awarded.

*General Damages*

In *Wainwright*, 774 So.2d 70 at 74 (alteration in original), the standard to be used by an appellate court when reviewing a quantum award was set forth by our supreme court:

> The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.,* 623 So.2d 1257, 1260 (La.1993). Moreover,

> > before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

> *Coco v. Winston Indus., Inc.,* 341 So.2d 332, 334 (La.1977) (internal citations omitted).

It is not our role to determine what we feel is an appropriate award. While we may have found this award on the high side, we can only disturb the trier of fact's determination if it abused its discretion. *Youn,* 623 So.2d 1257. Considering the injuries the trial court attributed to the accident, particularly Hairston's significant knee injury, we do not find it abused its discretion in awarding him $195,000 in general damages. *See Lawrence v. Government Employees Ins. Co.*, 13-1296 (La.App. 4 Cir. 10/15/14), 151 So.3d 917, *writ denied*, 14-2382 (La. 2/6/15), 158 So.3d 821.

## CONCLUSION

The judgment of the trial court in favor of the plaintiff-appellee, Rickie Hairston, is affirmed. All costs of this appeal are assessed against the defendants-appellants, Baldwin & Lyons, Inc., Oakley Trucking, Inc., and Shermain Montiel Vaughn.

**AFFIRMED**.