594 So.2d 505 (1992)
Marguerite TURCICH, et al.,
v.
Barbara BAKER and Allstate Insurance Company.
No. 91-CA-760.
Court of Appeal of Louisiana, Fifth Circuit.
January 31, 1992.
*506 Carl R. Danna, New Orleans, for defendant/appellee.
Miles Mark, Metairie, for intervenor/appellee.
Daryl A. Higgins, Gretna, for plaintiff/appellant.
Before GRISBAUM, WICKER and GOTHARD, JJ.
WICKER, Judge.
This appeal arises from a suit for personal injury filed on behalf of Marguerite Turcich, plaintiff/appellant, against Barbara Baker (Baker) and Allstate Insurance Company (Allstate), defendants/appellees. Valley Forge Insurance Company filed a petition for intervention for medical payments it alleged were paid to Turcich. The jury found Baker 100% negligent and awarded $15,000.00 in damages. The trial judge rendered judgment accordingly. Turcich now appeals. We affirm.
Turcich filed suit against Baker and her insurer, Allstate Insurance Company (Allstate) alleging that on August 27, 1987 the vehicle which she was driving was struck from the rear by a truck driven and owned by Baker. The jury found Baker 100% negligent. That finding is uncontested. The sole issue on appeal relates to the award of damages. The jury assessed damages as follows:

Past, present and future
pain and suffering $ 5,000.00
 ___________
Past medical expenses $ 5,000.00
 ___________
Future medical expenses $ 3,000.00
 ___________
Residual disability $ 2,000.00
 ___________
TOTAL DAMAGES $ 15,000.00
 ___________

The trial judge rendered judgment of $15,000.00, interests, costs, and attorney's fees against Baker and Allstate.
Only Turcich appeals the judgment specifying the following errors:
1. The jury verdict in this matter reveals an abuse of discretion by the jury, insofar as the general damages portion of the award was grossly inadequate, in light of the evidence adduced at trial, and in light of the special damages assessed by that same jury, and
2. Plaintiff was prejudiced, with regard to the jury's award, by the admission, above objection, of irrelevant testimony regarding collateral sources of recovery.
Turcich seeks an amendment of the award from the $7,000.00 in general damages awarded to $90,000.00 to $100,000.00.

COLLATERAL SOURCE:
Appellant argues it was error for the trial judge to allow evidence to the jury of Turcich's receipt of "benefits of automobile medical payment insurance and/or health insurance." Counsel cites the case of Lefevre v. Allstate Insurance Company, 258 So.2d 397 (La.App. 4th Cir.1972) for the proposition that such evidence is inadmissible as being irrelevant. The Lefevre court reasoned at 402-403:
We note, in setting aside the jury's conclusion on damages, that further improper evidence was allowed to be presented. Hospitalization insurance in the amount of $10,000.00 collected by Mr. Lefevre because of premiums he paid for that coverage played no part in this suit for damages against the Burneys and their liability insurer. Therefore, consideration of this fact was entirely irrelevant to the issues of this case and should have been excluded.
We do not subscribe to a practice of disregarding jury verdicts, as may appear has been done here. However, when we consider the influencing circumstances of the incorrect legal conclusion on proximate cause involving Mrs. Lefevre's alleged negligence, the improper question which planted a seed of doubt that the child may have himself caused *507 the accident, and allowance of evidence of hospitalization insurance which indicated that the Lefevres had been reimbursed for almost all of their medical expenses, we are compelled to conclude that the jury award did not adequately compensate the child for the serious injury that he sustained.
Appellees argue that the Lefevre case is distinguishable since the testimony in the instant case was relevant for the purposes of impeachment. They cite La.C.E. art. 607 for authority for the admissibility of such evidence.
La.C.E. art. 409 provides:
In a civil case, evidence of furnishing or offering or promising to pay expenses or losses occasioned by an injury to person or damage to property is not admissible to prove liability for the injury or damage nor is it admissible to mitigate, reduce, or avoid liability therefor. This Article does not require the exclusion of such evidence when it is offered solely for another purpose, such as to enforce a contract for payment. [emphasis added].
Article 607D further provides for the admissibility of evidence for impeachment.
Article 607 provides:
Attacking and supporting credibility generally
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Comment (o) to this provision states:
(o) Paragraph D is not intended to change the broad, traditional policy, based on waiver and fair play, permitting freer admissibility of extrinsic evidence to counter a witness' testimony after an adverse party has "opened the door" to otherwise inadmissible evidence. In such instances, the generally restrictive rule of this Paragraph may be relaxed. See Arts. 102, 403, and 611(A). See also State v. Finnice, 285 So.2d 187 (La.1973); State v. Howard, [230 La. 327] 88 So.2d 387 (La.1956); State v. Fletcher, [210 La. 409] 27 So.2d 179 (La.1946).
On cross examination Dr. Ehrenberg, an expert chiropractor, was shown an insurance form which he filled out for Turcich relative to his treating her for an unrelated knee problem. He reviewed the insurance form and was questioned about a back adjustment he wrote in. He stated the back problem was unrelated to the accident. Turcich's counsel did not object to this line of questioning based on the insurance form.
When defense counsel inquired whether Dr. Ehrenberg asked if a patient has health insurance Turcich's counsel did not object to that question. However, Turcich's counsel objected when defense counsel later asked:

*508 Q. On the insurance forms that you submitted for payment to her insurance company
Following a bench conference this line of questioning ceased with no ruling from the trial judge.
Dr. Battalora, an expert Orthopedist, testified on cross examination Turcich discontinued therapy because she could not afford it. He was asked whether he was aware she had two coverages. Turcich's counsel objected to this question. However, the trial judge overruled the objection after defense counsel pointed out Turcich had opened the door to such questioning by saying she could not afford the therapy.
However, upon further questioning Dr. Battalora stated he was not aware she had health insurance.
Turcich was asked on direct examination by her counsel the following:
Q. We heard some talk about you had all those insurance policies paying for all these medicals. Have all these medicals been paid by insurance policies.
A. No, sir.
Q. And have you gotten letters from Mercy Hospital and others putting you on notice for payment of these bills?
A. That is right because they weren't paid for, so I couldn't go back. I didn't have the money to do it. I had my receipt, but it was all taken away.
Q. The point being, `mam, the insurance that has been alleged has not provided coverage?
A. That is right.
We agree with appellees that the testimony of insurance payment was introduced for the purpose of impeachment. We find no abuse of the trial judge's discretion in allowing further questioning in that regard by defense counsel. Furthermore, the testimony indicated there was no full coverage. Thus the jury heard no testimony that her medical bills were entirely paid by a collateral source. The jury also heard no evidence as to the amount paid by the collateral source.
Additionally, appellant's counsel did not request the trial judge to instruct the jury as to the purpose for the admissibility of this evidence. Accordingly, his failure to object constitutes a waiver of any alleged error in that regard as provided for by La.C.E. art. 105.
La.C.E. art. 105 provides:
When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. Failure to restrict the evidence and instruct the jury shall not constitute error absent a request to do so.

QUANTUM
We conclude the jury did not abuse its discretion in assessing damages. Reck v. Stevens, 373 So.2d 498 (La.1979). Turcich's treating physician, Dr. Battalora, an expert in orthopedic surgery, testified she had a chronically mild to moderate cervical strain from the accident and a preexisting arthritis condition. He did not think it probable she had a ruptured disc.
Battalora testified he treated Turcich on September 3, 1987 after the accident. She was 64 years of age at the time. He had treated her twice before in 1973 for an ankle injury and in 1984 for a foot problem. The 1987 visit was the first time she complained of neck pain. He saw her two weeks after the accident.
He examined her and did not find she was in severe pain. The x-rays revealed degenerative arthritic changes. He stated:
I thought that she had sustained a cervical strain injury. I also felt she had preexisting arthritic changes involving the lower cervical segments. At that time I advised that she get a soft cervical collar to wear out of bed. I put her on some pain medicine, as well as muscle relaxant medication. I told her to go ahead and use heat several times a day, as well as limit her activities. And come back in a couple of weeks.
On September 18, 1987 she returned but she was not improved although she felt "somewhat better." He referred her to *509 Mercy Hospital for physiotherapy. When she returned October 19, 1987 she reported she was not improved. He told her to continue therapy. On that examination he found:
she did have full rotation to the left side, as well as full extension of the neck. And she also had normal flexion of the right rotation. There was no spasm of the neck musculature.
He thought "she had improved a little bit."
Her next visit was November 2, 1987. She still complained of pain. On that date he found "slight diminution of the left rotation of the neck. But there was no spasm."
He saw her on December 4, 1987; April 15, 1988; May 5, 1988; August 1, 1988; May 29, 1989, and finally on December 4, 1989. In December, 1987 she was hospitalized for kidney stones and missed therapy for a month. In April, 1988 she stated therapy did not help her and discontinued treatments. Additionally, she was having financial problems with the treatments. She continued to complain of constant pain. In May, 1988 she asked to resume therapy but when she returned in August, 1988 she felt she had not improved. On that date he noted:
On examination, cervical spine, motion is somewhat guarded. There was some limitation in all ranges. This is very mild. There was no spasm. Again, she is tender to the left side of the neck over the left cervical trapezius muscle. Shoulder motion was normal. She has complaints of pain in the left side of the neck when the shoulder is elevated.
Because of her persistent complaints he recommended a cervical myelogram. She refused because she was fearful of an allergic reaction. He suggested an MRI but she refused and stated she was claustrophobic. On that final visit of December 4, 1989 he stated:
She still had the same neck complaints... She did have limitations of cervical spine movement. She had no complaints of referred pain into the arms. And she had normal reflexes.
He felt the changes in her neck were the "result of degenerative arthritis." Her condition is chronic. If it continues to persistent then she would be a candidate for surgery.
On cross examination he stated that on October 19, 1987 there were no objective findings of injury; there was only her subjective complaint of pain.
His bill was $400.00. Her accident was August 27, 1987 and by October 19, 1987 her treating physician reported no objective findings of injury. The jury evidently gave his testimony greater weight than that of her treating chiropractor.
Dr. Ehrenberg, an expert Chiropractor, testified he first treated Turcich October 1, 1990 for the accident of August 21, 1987. It had been over two years since she had last had physical therapy. It was probably 10 months since she had seen a doctor for her neck. His examination revealed:
a loss of range of motion. There was a lot of tightness in the musculature, predominately on the left side of her neck, and the upper back.
* * * * * *
The x-rays revealed the presence of degenerative disk [sic] disease throughout her cervical spine. Loss of normal cervical curve, and some osteoporosis [demineralization of the bone].
He felt these were longstanding arthritic problems. He also felt the trauma of being struck from the rear would aggravate these preexisting conditions.
He treated her with a "light force technique". This technique gave her relief from pain. He last treated her the month of trial. He planned to continue treating her. His total bill was $2,692.28.
On cross examination he stated he originally saw her September 29, 1990 for a knee problem. On that visit she did not mention the accident.
We find no abuse in the jury's discretion in its award. The jury apparently gave great weight to the testimony of Dr. Battalora. Further, the jury saw and heard the testimony of plaintiff and must have concluded *510 that her complaints of pain were exaggerated. Accordingly, the judgment is affirmed.
AFFIRMED.