746 So.2d 665 (1999)
Russell L. and Elizabeth B. LeBLANC, et al., PlaintiffsAppellants,
v.
ACADIAN AMBULANCE SERVICE, INC., et al., Defendants Appellees.
No. 99-271.
Court of Appeal of Louisiana, Third Circuit.
October 13, 1999.
Rehearing Denied December 8, 1999.
*668 Paul H. Dué Kirk Andrew Guidry, Baton Rouge, for Russell L. and Elizabeth LeBlanc.
James E. Moore, Jr., Willam Carl Shockey, Baton Rouge, for Acadian Ambulance Service, Inc. et al.
Before DOUCET, C.J., AMY and SULLIVAN, Judges.
AMY, Judge.
The plaintiff alleges extensive injuries from an automobile accident in which his vehicle was struck by an ambulance owned by Acadian Ambulance. The trial court found in favor of the plaintiff, awarding both special and general damages. Both parties appeal. The plaintiff maintains that the jury erred in awarding inadequate damages, both general and special. The defendants have answered the appeal seeking reductions in the awards for loss of past wages and benefits, lost earning capacity, and medical expenses. We have amended the judgment in favor of the *669 plaintiff in the areas of medical expenses, general damages, and loss of consortium. Further, we reverse the trial court's decision to assess a portion of the court costs to the plaintiff. In all other respects, we affirm the judgment entered by the trial court.

Factual and Procedural Background
On November 29, 1992, Russell LeBlanc was eastbound on Interstate 10 near Baton Rouge, Louisiana when he became involved in the three-vehicle accident now at issue. The accident occurred when an ambulance owned by Acadian Ambulance Service, Inc., and driven by one of its employees in the course and scope of his employment, hit a Jeep Cherokee on the roadway which, in turn, struck LeBlanc's vehicle from the rear. LeBlanc was taken to the hospital following the accident for treatment and was released later in the evening.
The record reflects that in the months and years following the accident, LeBlanc was treated extensively, including several surgeries, for both back and neck-related problems. He was also diagnosed with carpal tunnel syndrome in both arms which was treated with surgery. Although he returned to work as a systems analyst with DynMcDermott Petroleum Operations Company following the accident, LeBlanc's work schedule began to decrease and he was eventually terminated with the company due to time spent away from work for medical treatment, surgery, and LeBlanc's assertion that he could not work due to pain. Furthermore, LeBlanc, a major in the United States Army Reserve, alleges that he became unable to pass the required physical and, in 1995, was placed on nondeployable status and removed from active drilling status.
LeBlanc and his wife, Elizabeth LeBlanc, individually and on behalf of their three minor children, filed suit seeking recovery for injuries related to the accident. LeBlanc claimed entitlement to medical expenses, general damages, loss of earning capacity, lost past and future wages, and permanent disability. Mrs. LeBlanc and the children sought recovery for loss of consortium. Acadian Ambulance Service, Inc. (Acadian), Justin Cox, the driver of the ambulance, and Acadian's insurer, Insurance Company of North America (INA) were named as defendants.
The matter was heard by a jury in January 1998. The parties stipulated that the defendants were liable for the accident. At issue was the causation of the damages alleged by LeBlanc and the extent of any such damages. The jury awarded the following:

Physical/mental pain and suffering: $140,000.00
Physical disability: $13,000.00
Past medical expenses: $100,000.00
Future medical expenses: $0.00
Loss of past wages: $144,000.00
Loss of future earning capacity: $51,000.00
Loss of employment benefits: $11,000.00
Loss of military retirement: $0.00

The jury denied any award for loss of consortium to LeBlanc's wife and three sons.
LeBlanc appeals and asserts that the trial court committed reversible error in denying his pre-trial motions in limine filed in an attempt to exclude reference to payment of expenses by a collateral source and questioning related to his income tax returns. He contends these errors require a de novo review by this court. Alternatively, the plaintiff argues that the jury erred in making insufficient awards for pain and suffering, physical disability, past medical expenses, loss of past wages, loss of future earning capacity, and loss of employment benefits. LeBlanc further contends the jury erred in failing to make any award for future medical expenses, loss of military retirement, and loss of consortium. Finally, LeBlanc asserts the trial court erred in assigning him twenty-five percent of court costs.
The defendants have answered the appeal and assert that the jury erred in awarding excessive damages for loss of *670 past wages/benefits and in finding that any award was appropriate for lost earning capacity. The defendants also maintain that the award for medical expenses should be reduced.

Discussion

Collateral Source Rule
Before trial, the plaintiff filed a motion in limine in an attempt to prevent the defendant from presenting evidence regarding payments made for medical expenses by collateral sources, namely, the plaintiffs medical insurer, Aetna. LeBlanc contends that questioning along these lines was prejudicial and the erroneous ruling permitting this evidence is reversible error. He asks that this court conduct a de novo review of the record. The defendant contends that the ruling did not violate the collateral source rule, as the evidence was limited to that regarding LeBlanc's credibility. In particular, the defendant contends that questioning was permissible as it related to whether the plaintiff informed Aetna that there was potential third-party liability and whether he completed and forwarded a reimbursement agreement which would require him to use proceeds obtained from Acadian and INA to repay payments made by Aetna.
La.Code Evid. art. 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible." Even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403.
Given the type of evidence regarding health insurance offered by the defendant, and objected to by the plaintiff, the general rules of Article 402 and Article 403 must be viewed alongside La.Code Evid. art. 409 which provides as follows:
In a civil case, evidence of furnishing or offering or promising to pay expenses or losses occasioned by an injury to person or damage to property is not admissible to prove liability of the injury or damage nor is it admissible to mitigate, reduce, or avoid liability therefor. This Article does not require the exclusion of such evidence when it is offered solely for another purpose, such as to enforce a contract for payment.
In Francis v. Brown, 95-1241 (La.App. 3 Cir. 3/20/96); 671 So.2d 1041, a panel of this court found Article 409 to prohibit the introduction of the type of payments made by an independent source which are also excluded by the "collateral source rule." This rule provides "`that the tortfeasor may not benefit, and an injured plaintiffs tort recovery may not be diminished, because of benefits received by the plaintiff from sources independent of the tortfeasor's procuration or contribution.'" Id. at p. 7; 1046 quoting Kidder v. Boudreaux, 93-859 (La.App. 3 Cir. 5/19/94); 636 So.2d 282, 284, writ denied, 94-1150 (La.10/7/94); 644 So.2d 629, writ denied, 94-1640 (La.10/7/94); 644 So.2d 630.
In Francis, the plaintiffs motion in limine was granted prior to trial prohibiting reference to payment of medical expenses by her attorney. However, at trial, the defense was allowed to cross-examine the plaintiff and elicit testimony indicating that she did not have money to pay for an emergency room visit and that she arrived at another doctor's appointment with a check for five hundred dollars. The trial court found this type of questioning properly within the parameters of cross-examination. On appeal, this court found otherwise stating:
Clearly, this exchange violated the "collateral source" rule. A tortfeasor may not benefit because plaintiff benefitted from an independent source. La. Code Evid. art. 409 prevents introduction of such evidence. To allow a jury to consider such evidence can only lead to unjust results. If a jury could consider *671 the occasion where a defendant makes certain payments to a plaintiff, it could be misconstrued that the defendant made an admission of liability. To allow a jury to hear evidence that plaintiff's attorney provided the funds for her medical expenses only fanned the flames of the prejudice that now exists against civil litigants and their attorneys. A jury should not be guided by bias, prejudice, passion, or sympathy, but should coolly and dispassionately weigh the facts and the law to reach a just and proper verdict.
Francis, 95-1241, p. 9-10; 671 So.2d at 1047.
Our review indicates that the majority of evidence introduced here does not run afoul of the considerations of the collateral source rule discussed above. Rather, a portion of the evidence dealt with whether LeBlanc informed Aetna that there was potential third-party liability and whether he completed a reimbursement agreement form with the company. Although the plaintiff argues that a variety of evidence existed that such a form was completed, e.g., Aetna's payment of the medical expenses, and therefore, any probative value was exceeded by the prejudicial impact, we do not find that the trial court was required to find that the evidence was such that it precluded leaving this credibility determination to the jury. In its limited use for credibility, we find no abuse of the trial court's discretion.[1]
Similarly, in Turcich v. Baker, 594 So.2d 505 (La.App. 5 Cir.1992), the fifth circuit concluded that the trial court did not improperly admit evidence regarding the plaintiff's receipt of insurance benefits since this evidence was offered for impeachment purposes after the plaintiff testified she did not continue medical treatment because she could not afford the care. The court found that not only was the testimony offered strictly for impeachment purposes, but that the plaintiff was later able to testify that the medical insurance she had did not provide coverage for the treatment sought. The fifth circuit reasoned as follows:
We agree with appellees that the testimony of insurance payment was introduced for the purpose of impeachment. We find no abuse of the trial judge's discretion in allowing further questioning in that regard by defense counsel. Furthermore, the testimony indicated there was no full coverage. Thus the jury heard no testimony that her medical bills were entirely paid by a collateral source. The jury also heard no evidence as to the amount paid by the collateral source.
Id. at 508.
In the instant matter, had evidence of a collateral source been limited to evidence *672 potentially related to credibility, our review would end here. However, much of the evidence submitted with regard to insurance payments was improperly permitted by the trial court. In particular, we point to evidence that Aetna paid less than the amount charged for some of the medical treatment because service was rendered by a preferred provider organization (PPO discounts). The jury was informed of these PPO discounts, in the amount of $42,215.26, and was also told of a $34,979.21 payment made by the defendant for medical treatment. In addition to the prejudicial aspects of the collateral source rule which would preclude this type of information, the information does not survive the analysis of Article 403 since any "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." In fact, not only was this information provided to the jury, but no information was given to the jury indicating how these discounts should be applied, if at all.
In the plaintiff's closing statement, and in a recapitulation of medical expenses presented as an exhibit, the jury was provided with the sum of $219,899.61 for the total amount of medical expenses incurred. Then, jurors were given the figure of $184,920.40 which was the purported sum after PPO discounts were applied. Finally, they were provided the total medical expenses with both the PPO discounts and credit for prior payments by defendants deducted, the sum of $142,705.14. After being given this information of a collateral insurance source and previous payments by the defendant, no information was given to the jurors as to how they might apply these discounts or credits. The judge instructed as follows:
You should not award an amount for medical expenses merely because they have been incurred. Rather, you should first determine whether the medical expenses were incurred for injuries caused by the accident.
An action is a cause in fact of an injury if it is a "substantial factor" in bringing about harm to the plaintiffs. The defendants The defendant, excuse me, may not benefit, and an injured plaintiff's tort recovery may not be diminished, because of the benefits received by the plaintiff from sources independent of the defendant's procuration or contribution.
Given the potential for prejudice and confusion regarding the application of this information, we conclude that the trial court erred in not excluding information regarding any PPO discounts, which will be discussed below, and any information regarding previous payments by the defendants.
The confusing nature of such information being provided to the jury can be seen in our attempt to review the jury's award. Medical expenses in the amount of $219,899.61 were claimed by the plaintiff. This sum was broken apart into specific fees in the recapitulation of medical expenses presented to the jury. However, an even sum of $100,000.00 for past medical expenses was awarded by the jury. There is no indication whether credits/discounts were applied to this figure by the jury or which of the many surgeries and related expenses were found to be attributable to the defendant. Thus, the presence of such potential confusion precludes our ability to decipher many of the jury's factual findings, an inability which requires less deferential review in several of the areas as will be seen below.

Income Tax Returns
Next, LeBlanc contends that the trial court erred in denying the motion in limine filed prior to trial to prevent questioning regarding the accuracy of answers and deductions found on his income tax returns. He contends that the defendant sought to question him in an attempt to demonstrate that he took improper deductions for the years in question. He maintains *673 that this evidence was presented merely as a "bad act" which is prohibited by La.Code Evid. art. 608(B) and Article 404(B). LeBlanc contends that even if Articles 608(B) and 404(B) are found not to be applicable here, La.Code Evid. art. 403 precludes its introduction as the probative value is substantially outweighed by potential prejudice.
The plaintiff contends that La.Code Evid. art. 404(B) is applicable in this case. It provides, in part:
B. Other crimes, wrongs, or acts.
(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of notice, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it related to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The plaintiff further argues that any questioning regarding the tax returns is also prohibited by Article 608(B) which provides:
B. Particular acts, vices, or courses of conduct. Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Article 609 and 609.1 or as constitutionally required.
Our reading of the Code of Evidence indicates that the above articles are not necessarily applicable in this civil matter. However, Article 607 provides as follows with regard to attacking and supporting the credibility of a witness:
A. Who may attack credibility.
The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
LeBlanc entered into evidence the federal tax returns he and his wife submitted for the years 1988 through 1996. These returns revealed LeBlanc's income for these years which were used by the plaintiff's expert in economics, Dr. Randy Rice, and were submitted to the jury. Prior to trial, LeBlanc filed a motion in limine asking the court to prohibit any "mention of the fact that [he] may have provided *674 inaccurate information and taken undeserved deductions on his income tax returns, the revelation of which is irrelevant to the central issue in this case, is unduly prejudicial to plaintiffs, poses a real threat of an inordinate delay and waste of valuable trial time and which may rely on inadmissible extrinsic evidence." The trial court subsequently denied the motion. We find no abuse of discretion in this denial.
Our review of the questioning complained of does not reveal that the cross-examination of LeBlanc and the accountant who prepared the returns was pursued in order to demonstrate "bad acts" as argued in LeBlanc's brief. Rather, the evidence sought by the defendant seems to generally be that permitted by La.Code Evid. art. 607. For instance, LeBlanc testified that he considered his job in New Orleans to be a permanent one, yet, on cross-examination, the defense brought out that he had taken deductions for temporary living expenses related to maintaining his apartment in the New Orleans area. Additionally, the plaintiff testified he had a difficult time sitting or driving for lengthy periods, but deductions were taken for substantial business-related mileage. Finally, although the plaintiff testified he was unable to work for part of the period for which returns were provided, he took business deductions for his computer. Accordingly, we find no abuse of discretion in the denial of the motion, as this evidence is supportive of the defendant's position that the plaintiff could or was working and that the position he held prior to and immediately after the accident was temporary rather than permanent as he urged. These considerations could have been important in the jury's calculations for employment-related damages.
Finally, LeBlanc contends in his brief that cross-examination as to the particular deductions and expenses taken was not only improper in itself, but that it permitted the defendant to make an improper argument to the jury in its closing. The passage referred to by LeBlanc is as follows:
And who fudged on his taxes, you know, by claiming his temporary employment, the job with Boeing, and who had no employer requiring him to do work at home but yet deducting computer expenses? And who was deducting computer expenses in 1996 even though they had no work and no income or at least that's what we're told? And who went to the Functional Capacity Evaluation and came in here and told us a totally different tail [sic] from the truth about the FCE process? And who failed the validity criteria that were built into the Functional Capacity Examination such that there was an equivocal or indeterminable result. That was Mr. LeBlanc.
Our review of this portion of the argument reveals that even if this statement was directed toward any "bad act" or purported crime, as argued by LeBlanc, the record does not reveal that any objection was made to the closing argument. "Absent objection at trial, error cannot be raised for the first time on appeal. Failure to object constitutes a waiver of the right to complain on appeal." McWard v. Independent Fire Ins. Co., 482 So.2d 984, 985 (La.App. 3 Cir.1986). See also Martinez v. Schumpert Medical Center, 27,000 (La. App. 2 Cir. 5/10/95); 655 So.2d 649. Therefore, even if improper, the trial court was not afforded an opportunity to provide a limiting instruction to the jury. Thus, LeBlanc's argument in this regard is not proper for review.

Damages
With regard to the quantum of damages awarded, we are considering claims of both LeBlanc, who is seeking at least an increase in each of the category of damages, and the defendants, who have filed an answer asking for a decrease in the awards for loss of past wages/benefits, lost earning capacity, and past medical expenses. Throughout our review of the damages, we are mindful that factual findings *675 of a trial court, in both judge trials and jury trials, are subject to the manifest error standard of review on appeal. Powell v. Regional Transit Authority, 96-0715 (La.6/18/97); 695 So.2d 1326. See also Stobart v. State Through DOTD, 617 So.2d 880 (La.1993). Discussing this standard in Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, p. 8-9 (La.7/5/94); 639 So.2d 216, 221, the Louisiana Supreme Court stated as follows:
Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La.1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support.
While the supreme court has expressed that factual findings are subject to the manifest error standard of review, the court has also indicated that, in some circumstances a less deferential standard may be required. In Bloxom v. Bloxom, 512 So.2d 839, 843 (La.1987), the court reviewed the trial court's findings in the case and determined that they were not due the deference ordinarily afforded decisions of triers of fact. Justice Dennis explained as follows:
The trial court's reasons do not articulate the theory or the evidentiary facts upon which its conclusion is based. Nor can we infer from the trial court's reasons and the record the theory under which the trial court found the product to be unreasonably dangerous to normal use. Although we may accord deference to a decision of less than ideal clarity if the trial court's path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record, we will not supply a finding from the evidence or a reasoned basis for the trial court's decision that it has not found or that is not implied. Cf. Save Ourselves v. La.Environ. Cont. Com., 452 So.2d 1152 (La.1984); Giallanza v. LPSC, 412 So.2d 1369 (La.1982); Baton Rouge Water Works v. Louisiana Public Service Com'n., 342 So.2d 609 (La.1977); cf. Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 477[447] (1974); 3 K. Davis, Administrative Law Treatise § 14:29 (1980) at 130.
Id. at 843.
As previously stated, the defendants stipulated to liability in this automobile accident. However, they reserved the right to contest the causal relationship between the accident and the medical expenses sought by the plaintiff. The verdict sheet submitted to the jury permitted their response in quantum only for each of the areas of damage. There is no indication which surgeries and related expenses were found to be causally connected to the accident of November 1992. When reviewed in light of the record, some areas of damage reveal the jury's path to their finding, in other areas, such a path cannot be reasonably discerned. Thus, on review, we are left with a jury verdict that does not consistently reveal the jury's conclusion as to what damages were related to the accident at issue. While respectful and deferential of the jury's verdict in those areas where such deference is appropriate, we conclude that some of the categories are so impenetrable and trouble-some *676 as to require the less deferential standard enunciated in Bloxom.[2]

Past Medical Expenses
Both parties contest the quantum of medical expenses awarded. As indicated in our discussion of the collateral source doctrine, LeBlanc claimed that he had incurred medical expenses related to the accident in the amount of $219,218.90. As discussed above, the jury was then provided with information regarding previous payments and PPO discounts. A general sum in the amount of $100,000 was awarded for past medical expenses. In an area that could have provided the greatest guidance in which of the claimed medical expenses the jury found to be related to the accident, we are faced with a general award for medical expenses that does not reveal the jury's considerations.
In Revel v. Snow, 95-462 (La.App. 3 Cir. 11/2/95); 664 So.2d 655, writ denied, 95-2820 (La.2/2/96); 666 So.2d 1084, a panel of this court dealt with a similar circumstance in that no reasons for the judgment below were given. As here, the plaintiff in Revel introduced evidence of a variety of injuries requiring treatment which she alleged were related to the accident at issue. The jury in that case awarded a general verdict rendering the appellate court unable to determine which injuries the jury found related to the accident. The court found that "[w]hen no specific findings of fact are issued, appellate courts consider the record as a whole in the light most favorable to the appellee." Id. at p. 6; 659 citing Homer Nat. Bank v. Springlake Farms, Inc., 616 So.2d 255 (La.App. 2 Cir.1993); Jeffers v. Hansen, 441 So.2d 283 (La.App. 4 Cir.1983); Texas Gen. Petroleum Corp. v. Brown, 408 So.2d 288 (La. App. 2 Cir.1981). After determining what injuries alleged were caused by the accident at issue in Revel, the court determined that the amount awarded for past medical expenses was inadequate and adjusted the quantum accordingly.
Similarly, no indication is given here as to the jury's findings regarding causation. The bulk of the plaintiff's claimed medical expenses related to the six surgeries he underwent subsequent to the accident. The expenses related to these surgeries, as well as the other medical expenses incurred, were provided to the jury as an exhibit. In closing arguments, the defendants contested the causal relationship between four of the surgeries and the accident. It is obvious from the $100,000 awarded that the jury found that more expenses were attributable to the accident than the relatively uncontested two carpal tunnel releases performed. Any of the remaining expenses could have been awarded by the jury; we simply cannot determine which were actually awarded. However, the instant matter presents even less of a basis for review than was present in Revel because the inability to decipher which medicals were compensated is compounded by the confusion possibly created by the discussion of credits and discounts previously addressed. This absolute absence of a reviewable basis combined with the legal error related to the credits/discounts requires that this court afford no deference to the jury's finding in this regard. Thus, employing the Bloxom standard, we do not afford the findings of the trial court the usual deference and review past medical expenses de novo.
*677 Our reading of the evidence presented by the parties indicates that the plaintiff proved entitlement to all medical expenses sought. Although the claimed expenses encompass many expenses incurred during the years after the accident, including physical therapy and testing, here we explain, by way of illustration, the proof of causation of only those related to the bulk of the expenses incurred, namely, those related to the six surgeries.
After the accident in November 1992, the plaintiff was transported by ambulance to a Baton Rouge hospital where he complained of arm, hand, neck, and lower back pain. LeBlanc testified that he had no pain in these areas prior to the accident. He was released that evening and soon thereafter reported to Dr. James LaFleur, an orthopedic surgeon. Dr. LaFleur testified that LeBlanc complained of neck, back, left arm pain, and finger numbness. Shortly thereafter, on January 29, 1993, Dr. LaFleur performed a left ulnar nerve and left carpal tunnel release on LeBlanc. In March 1993, a carpal tunnel release was performed on the right arm. Dr. LaFleur related these procedures to the accident. His testimony provides the preponderance of the evidence required for the plaintiff to recover expenses related to these procedures.
Due to LeBlanc's continued complaints of neck and back pain, Dr. LaFleur eventually provided LeBlanc with a list of other doctors from whom he might seek further help. LeBlanc chose Dr. Luiz DeAraujo, a neurosurgeon. Dr. DeAraujo testified that he first examined LeBlanc in March 1994. His testing led him to recommend in April 1994 that LeBlanc undergo an anterior cervical microdiscectomy and fusion at C4-5 and C6-7. When the surgery was performed, Dr. DeAraujo found that the microdiscectomy and fusion at only the C6-7 level was required. He stated he found a large dislodged fragment on the left side of the spinal canal during surgery. Dr. DeAraujo related the need for this surgery to the accident of November 1992.
Following the fusion at C6-7, LeBlanc's complaints of back and left leg pain continued. Additional testing eventually led to LeBlanc's fourth surgery, a laminotomy, foraminotomy and microdiscectomy at L4-5 which Dr. DeAraujo performed on September 1, 1994. At trial, Dr. DeAraujo opined that this surgery too was necessitated by the ambulance accident. Furthermore, his notes contained progress reports from a physical medicine and rehabilitation specialist, Dr. Norman Anseman, to whom LeBlanc had been referred. Dr. Anseman concurred that the surgery was warranted. Dr. Anseman also related this fourth surgery to the accident.
During the time that LeBlanc was undergoing treatment from Dr. DeAraujo, he was also being treated by Dr. Robert L. Morrow, Jr., an orthopedic surgeon. Dr. Morrow testified that he first saw LeBlanc in March 1994 and that Dr. LaFleur first referred LeBlanc to him for treatment of continued hand problems, but that he eventually began to treat him for neck and lower back complaints. Due to continued complaints, Dr. Morrow referred the plaintiff to Dr. James Ricciardi, an orthopedic surgeon at Tulane Medical Center in New Orleans, in November 1995.
Dr. Ricciardi testified that his testing of LeBlanc led him to recommend an instrumented anterior/posterior fusion at the L4-5 level and then a fusion at L5-S1 if required. The surgery was performed on March 6, 1996 resulting in a fusion at L4-L5-S1. In a post-operative visit in June 1996, the plaintiff reported that his back was better after the surgery, but that his neck began hurting again. Dr. Ricciardi testified that an MRI that was brought in during LeBlanc's September 1996 visit revealed a herniation at the C4-5 and C5-6 levels. Dr. Ricciardi stated that a surgery at one level of the spine may put more pressure on the remaining levels. When LeBlanc reported that his neck pain had *678 grown too severe, Dr. Ricciardi performed an anterior cervical fusion at C4-5 and C5-6 levels. In subsequent visits, LeBlanc continued to report neck pain. Dr. Ricciardi opined that the accident of November 1992 was a contributing factor to the need for the surgeries he performed. Although Dr. DeAraujo testified that he did not believe these last two surgeries stemmed from the wreck, Dr. Morrow opined that the accident was related to both surgeries by Dr. DeAraujo and both of those performed by Dr. Ricciardi.
Based on the presence of this medical testimony linking all six surgeries to the accident, and little medical testimony contradicting these opinions, we find that the plaintiff proved, by a preponderance of the evidence that the related medical expenses stemmed from the accident. Thus, we find the plaintiff entitled to these expenses as well as the remainder of the expenses claimed.
Of course, the $219,218.90 of medical expenses incurred are subject to a credit for the $34,979.21 previously paid by the defendants. However, we do not conclude that the defendants are entitled to a deduction for the $42,215.26 discount earned due to the plaintiff's treatment by PPOs. In answering the appeal, the defendants ask this court to discount the amount awarded for medical expenses with regard to the PPO discounts. As previously discussed, the jury heard information indicating that although the $219,218.90 had been incurred, some of this treatment had come from medical providers who had reached an agreement with Aetna, the plaintiff's insurer. We have determined this information to be error as it was potentially misleading or confusing to the jury and, therefore, in violation of La.Code Evid. art. 403. We also point out that the jury was told only of the entirety of the PPO discount. No indication was given as to what discounts were incurred for each particular treatment. This is problematic if the jury found the defendants should have been credited for the discounts, but then found that only a portion of the medical expenses were related to the accident. The jury would have been unable to apportion the discounts appropriately. In their brief to this court, the defendants speculate that the jury gave no discount for the PPO discount. Notwithstanding our observations regarding the inability to apportion the discounts, we find that the entirety of the PPO discounts should be overlooked.
As discussed earlier, the collateral source rule provides that a "`tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be diminished, because of benefits received by the plaintiff from sources independent of the tortfeasor's procuration or contribution.'" Francis, 95-1241, p. 7; 671 So.2d at 1046. LeBlanc argues that this rule precludes the defendants from benefitting from discounts obtained through his own insurer. We agree.
The wording used in Francis as well as other collateral source rule cases, alone, appears to preclude the defendants' benefit from discounts obtained through the plaintiff. However, there is other jurisprudential support for this concept as well. In Brannon v. Shelter Mut. Ins. Co., 520 So.2d 984 (La.App. 3 Cir.1987), the plaintiff who alleged injury from an automobile accident held health insurance through her employer. The insurer paid a portion of the medical expenses incurred through the hospital where the plaintiff received treatment. This payment by the insurer apparently exceeded that which would have been paid by Medicaid, which would have also been available to the plaintiff if her insurance had not been available. The remainder of the debt was taken as a contractual adjustment by the hospital. Evidence indicated that the hospital had a policy of taking a loss for any amount not covered by Medicaid. A panel of this court applied the collateral source rule in denying the defendant tortfeasor's request to benefit from this contractual adjustment. The full amount of medical expenses was awarded. *679 See also Cooper v. Borden, Inc., 30,292 (La.App. 2 Cir. 2/25/98); 709 So.2d 878; Weir v. Gasper, 459 So.2d 655 (La.App. 4 Cir.1984), writ denied, 462 So.2d 650 (La. 1985).
The defendants maintain that it is the nature of the Medicaid program which precludes benefit from the deduction, as the program is one to benefit the indigent. The defendant argues that "LeBlanc was not indigent, and he received no aid by a provider. He never agreed to pay any amounts greater than those negotiated by Aetna. He never incurred an obligation, natural or otherwise, to repay the difference in rates." Allowing LeBlanc to recover the full amount of the expenses would be a "windfall" for the plaintiff, the defendants argue. We disagree and observe that if we accepted the defendants' argument, they would be the beneficiaries of such a windfall, i.e., they would benefit from lower prices contracted for by Aetna rather than paying the higher prices they would have had to pay if they had taken responsibility for the expenses initially. We find that such a benefit is contrary to the collateral source rule and, therefore, deny the requested credit.

Future Medical Expenses
LeBlanc contends that the jury erred in denying any award for future medical expenses. In particular, the plaintiff points to testimony from Dr. Morrow that he hopes to relieve LeBlanc of his ongoing muscular discomfort by having him undergo a strengthening program, including aquatic therapy.
Despite Dr. Morrow's testimony, no evidence was presented regarding the length or expense of the type of program described. In Revel, 95-462; 664 So.2d 655, this court explained that future medical expenses must be established with some degree of certainty. Furthermore, the court stated that "[a]wards will not be made in the absence of medical testimony as to the requirement for such expenses and their probable cost." Id. at p. 11; 661. As in Revel, we have no testimony in the present case as to the cost of any future treatment that may be required by Dr. Morrow or other physicians. Therefore, we find no error in the jury's determination that the plaintiff presented insufficient evidence in this regard.

Loss of Past Wages
The jury awarded $144,000.00 in past lost wages. LeBlanc points out that his expert, Dr. Randolph Rice, testified that his lost wages were $169,755.00. Thus, he asks this court to raise the amount of lost wages by $25,755.00. According to Dr. Rice's testimony, this figure was arrived at, in part, by utilizing LeBlanc's tax returns and that credit was given for wages earned while he was able to work. The defendants request a reduction of the award. Since they have speculated that the jury found that only three of LeBlanc's surgeries were related to the accident and Dr. DeAraujo found no physical problems with the plaintiff returning to work four months after the surgery, the quantum should be reduced. Not only is this argument pure speculation, it is now moot due to our award of all claimed medical expenses.
In Craven v. Universal Life Ins. Co., 95-1168 (La.App. 3 Cir. 3/6/96); 670 So.2d 1358, writ denied, 96-1332 (La.9/27/96); 679 So.2d 1355, we explained that a plaintiff seeking lost wages must demonstrate the length of time missed from work and the earnings lost. Furthermore, "[a]n award for past lost earnings is not subject to the much-discretion rule when it is susceptible of mathematical calculation from documentary proof." Mathews v. Dousay, 96-858, p. 15 (La.App. 3 Cir. 1/15/97); 689 So.2d 503, 513.
We find no reversible error in the jury's award of $144,000.00 for past lost wages. While this figure is less than that requested by the plaintiff, it appears to reflect the belief that, at some point, the plaintiff could return to work despite his complaints of pain. For example, Dr. Ricciardi testified that, although the plaintiff was *680 restricted to light duty, he believed that someone in the plaintiffs condition after of 1997 could return to work. It seemed to be of particular importance to Dr. Ricciardi that the nature of LeBlanc's computer work was sedentary and allowed him to refrain from lifting and permitted him to get up when needed. Furthermore, LeBlanc's complaints of pain to Dr. Ricciardi did not appear to be prohibitive of his return to work. Thus, the jury could have believed that LeBlanc could have returned to work after the final surgery in February 1997 which could attribute to the award given which was $25,755.00 less than was requested. While this award may not be precise, we find sufficient support to prevent a finding of reversible error.

Loss of Future Earning Capacity
LeBlanc contends that the jury erred in awarding only $51,000.00 for loss of future earning capacity. At trial, he asked the jury to award $519,646.00 for loss of earning capacity in the private sector and $39,460.00 for loss of earning capacity in the military. On appeal, he asks this court to raise the jury's award to at least $350,000.00. The defendants argue that the figure awarded is approximately one year of wages and assert that the figure is within the discretion of the jury.
In Este' v. State Farm Ins. Co., 96-99, p. 12-13 (La.App. 3 Cir. 7/10/96); 676 So.2d 850, 858, we stated as follows:
Damages for loss of earning capacity are speculative in nature. Therefore, in order for a plaintiff to recover for loss of earning capacity, she must show more than previous employment at a higher wage. It is the trial court's or jury's duty to assess the probability of her earning that wage in the future, but for the accident. Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La.App. 1 Cir.1982); Hobgood v. Aucoin, 574 So.2d 344 (La.1990). Expert economic testimony, plaintiffs physical condition before the accident, her work record, the amount earned in previous years, and the probability of earning similar wages of the remainder of her work life are some of the factors to be considered in determining loss of earning capacity. Harris v. Tenneco Oil Company, 563 So.2d 317 (La.App. 4 Cir.), writ denied, 568 So.2d 1062 (La.1990). Appellate review of loss of earning capacity awards, where there is uncertainty as to the existence of such damages, should be more deferential to the fact finder. Gardiner v. Commercial Union Ins. Companies, 488 So.2d 1331 (La.App. 3 Cir.1986).
The majority of the evidence presented indicates that the expert witnesses felt that the plaintiff should be able to return to some type of sedentary work. As explained above, Dr. Ricciardi felt that the plaintiff should be able to return to such a position. No time restrictions were given on this work. Furthermore, Dr. Morrow believed that after the plaintiff underwent a strengthening program to alleviate muscle discomfort he experienced due to a functional capacity evaluation at the end of 1997, he should be able to return to some type of work. Dr. Morrow believed that a flexible position offering around four hours of work per day would be possible. Furthermore, the occupational therapist performing the FCE in October 1997 reported that the plaintiff could perform at a sedentary job for four hours per day. Dr. Ricardo Leoni, a neurological surgeon, also testified and stated that he performed an independent medical examination four months prior to trial. He opined the plaintiff could return to sedentary work and that his position as a systems analyst fit within this category. He stated he would advise him not to lift more than ten to twenty pounds and to refrain from climbing, bending, and stooping. Dr. Leoni made no recommendations as to the number of hours per day he felt the plaintiff should be able to work.
Stan McNabb, a vocational rehabilitation counselor, testified that due to the plaintiff's *681 previous job training in a sedentary position, he had tremendous potential to return to work. He reviewed positions he felt were available to LeBlanc and stated that the plaintiff would need to have training in order to bring his computer skills up to date with those required by the current job market. McNabb believed this training could be completed in one to six months. Furthermore, he stated that modifications may be made in the workplace to accommodate his physical problems.
While no expert testified that the plaintiff's loss of future earning capacity is equal to the sum of $51,000.00, we do not find that the figure arrived at by the jury was an abuse of its discretion. We are mindful that particular deference is due the jury's finding in this particularly speculative category of damages. As related above, several witnesses felt that the plaintiff should be able to return to work for at least a partial workday. Furthermore, Dr. Ricciardi and Dr. Leoni put no time restrictions on the number of hours the plaintiff may be able to work. The sum awarded could approximately compensate the plaintiff for a period of time during Dr. Morrow's strengthening program as well as a retraining program. Thus, we find no merit in this assignment.

Loss of Employment Benefits
The jury awarded $11,000.00 for past lost benefits. LeBlanc contends this amount is inadequate, as Dr. Rice testified that the cost of placing the plaintiff on his wife's health insurance plan after his termination from DynMcDermott was $11,138.16. Furthermore, he contends that he should have been awarded sums for future health insurance costs and sums related to 401K contributions. The defendants argue that the $11,000.00 awarded was excessive and that it should be reduced to $2,700.00 by using a calculation advanced by them.
Due to our finding that the jury was justified in believing that the plaintiff could return to work, we are concerned here only with past lost benefits. As noted above, Dr. Rice stated that after the plaintiff lost his health coverage with DynMcDermott, he was added to his wife's policy. The figure for this additional coverage was $11,138.16.[3] We conclude that the $11,000.00 should be raised to that figure offered by Dr. Rice.
The plaintiff also seeks recovery for past fringe benefits in the way of 401K contributions and retirement payments. We find no error in the jury's determination that these were not adequately proven by the plaintiff. Dr. Rice testified only as to the figure attributable to past and future contributions in these areas. His figures were not broken down in order for the jury to award only past contributions. The plaintiff is, of course, responsible for shaping the direction of his own case and the strategic decisions involved in presenting the evidence. Our review of the evidence presented in this area indicates that any award for past fringe benefits would have been speculation on the part of the jury. Therefore, we decline to raise this award.

Loss of Military Retirement
The jury denied any award in this category. On appeal, the plaintiff asserts that due to his injuries he was placed on nondeployable status, thus causing him to lose drill pay and retirement opportunities with the Army Reserves. He contends that he is owed lost past drill pay, in the amount of $34,220.00, and future drill pay until his anticipated 2001 retirement date in the amount of $39,460.00. Further, he contends that since he can no longer attend *682 weekend and summer drills with the reserves, he was denied the opportunity to receive military retirement benefits which Dr. Rice determined to be $144,412.00. We disagree.
With regard to LeBlanc's military service, the jury was presented with confusing information. While there was indication that LeBlanc may not have been able to pass future military examinations as is required to maintain deployable status, and was given a physical profile with the military, there is little indication with regard to LeBlanc's subsequent physical examinations with the military. Furthermore, it is unclear whether there were any other options available to LeBlanc in the military due to his computer training. Although it would have been in a nondeployable status, there was apparently some possibility for LeBlanc to continue providing programming skills to the Army. LeBlanc received a letter dated January 8, 1995, which informed him of his removal from active drilling status. The letter stated as follows:
1. Due to your continuing physical condition, which places you in a non-deployable status, your inability to attend regular training assemblies, we are unable to continue you in active drilling status with the Headquarters and Headquarters Company, 377th Theater Army Area Command.
2. We would like to express our appreciation to you for the excellent service you have provided to the command in the past, particularly in programming computer applications to reduce the manual workload of managing the vast amounts of data with which we deal.
3. Request you complete a Request for Transfer to the USAR Control Group (IRR) not later than 31 January 1995, forwarded through your staff section to the Headquarters Company.
An attached evaluation states as follows: "Maj LeBlanc should be assigned to a non-deployable position so that the Army can benefit from his tremendous programming skills." Despite this information regarding the possibility of reassignment, the jury was given no indication what this type of work may have entailed or whether it might have provided additional income.
With regard to military retirement, we find that, here too, the jury was not required to find that LeBlanc met his burden of proof. While LeBlanc claimed that he would be eligible for retirement benefits at the end of his service, his records do not reflect such a qualification. According to testimony heard at trial, a reserve member's ability to receive military retirement is based, in part, on the number of points or credits he is able to amass during his career for drills and military functions. However, LeBlanc's military records reflect far fewer points than he had allegedly earned. He argues that this discrepancy is due to the military's poor record keeping and that the situation could be rectified. LeBlanc contends that pay vouchers and other documents can demonstrate the accurate number of points earned. We do not find error in the jury's determination that these records provided too speculative a basis on which to make an award. Not only is there no indication that the plaintiff would have necessarily reached retirement, but there is no guarantee that he would have been able to correct his records and have the military recognize the number of hours claimed. No successful attempt in this regard had been made at the time of trial.[4] Accordingly, this assignment is without merit.

*683 General Damages

The jury awarded $140,000.00 for physical and mental pain and suffering, past, present and future. Additionally, $13,000.00 was awarded for physical disability. We review these sums together as general damages. See Este', 96-99; 676 So.2d 850.
In Andrus v. State Farm Mut. Auto. Ins. Co., 95-0801, p. 8 (La.3/22/96); 670 So.2d 1206, 1210, the Louisiana Supreme Court explained the review of general damages as follows:
The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Only if the reviewing court determines that the trial court has abused its "much discretion" may it refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion.
(Citations omitted.)
Our review of the evidence indicates that the $153,000.00 in general damages awarded in this matter is unreasonably low. LeBlanc has undergone six surgeries, has reported varying degrees of pain throughout the years, and continues to report that he cannot function without pain. Furthermore, he testified that his lifestyle has been curtailed in that he can no longer participate in sports with his sons, can no longer take care of the yard or garden as he once did, and cannot hunt. Furthermore, there is evidence indicating that the plaintiff may not be able to work for more than four hours per day. Mrs. LeBlanc testified that the plaintiff has little patience to assist their children with their school work and that their sexual relations have been curtailed due to the accident. She also stated that they do not attend social functions as often as they did prior to the accident. We believe these factors indicate the damages awarded by the jury are unreasonably low.
As explained above, after determining that an award of general damages is unreasonably low, we must reference similar cases to determine the lowest point of award that would have been within the jury's discretion. In this instance, we award the plaintiff $250,000.00. See Spangler v. Wal-Mart Stores, Inc., 95-2044 (La. App. 1 Cir. 5/10/96); 673 So.2d 676, writ denied, 96-1407 (La.9/27/96); 679 So.2d 1353, writ denied, 96-1450 (La.9/27/96); 679 So.2d 1353; Watterson v. Mallard Bay Drilling, 93-1494 (La.App. 3 Cir. 10/12/94); 649 So.2d 431, writ denied, 94-2769 (La.1/27/95); 650 So.2d 241, cert. denied, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995); Hutchinson v. Wal-Mart, Inc., 573 So.2d 1148 (La.App. 1 Cir.1990). Thus, we amend the award of general damages to $250,000.00.

Loss of Consortium
The plaintiff contends the jury erred in denying any award for loss of consortium to Mrs. LeBlanc and the three LeBlanc children. The defendants contend that the jury's decision in this area should not *684 be disturbed, and they point to evidence indicating family stresses and strains prior to the accident.
In Mathews, 96-858, p. 18; 689 So.2d at 515, a panel of this court explained as follows with regard to loss of consortium:
The compensable elements of damage in a claim for loss of consortium include loss of society, sex, service, and support. Lonthier v. Northwest Ins. Co., 497 So.2d 774 (La.App. 3 Cir.1986)
. . . .
As with general damage awards, the trier of fact is given much discretion in its deliberations concerning awards for loss of consortium. Doucet v. Doug Ashy Bldg. Materials, Inc., 95-1159 (La. App. 3 Cir. 4/3/96); 671 So.2d 1148. Whether a party is entitled to loss of consortium damages is a question of fact, and a finding of fact cannot be overturned on appeal absent manifest error. Lonthier, 497 So.2d 774.
Our review of the evidence reveals manifest error in the jury's determination that Mrs. LeBlanc was not entitled to an award for loss of consortium. In virtually uncontested testimony, she testified that, since the accident the couple's sex life had been diminished and that her husband was not the same person he had been prior to the accident. She also testified that her husband's ongoing medical problems and lawsuit had caused her stress at her place of employment. Further, Mrs. LeBlanc testified as to their diminished social life and stated that they "basically stay home all the time." Finally, Dr. John Bolter, a clinical neuropsychologist met with the LeBlancs and testified at trial. He testified as to strains he witnessed in the couple's marriage which were consistent, if not more extreme, than the views offered by Mrs. LeBlanc. She stated that, since their visit with Dr. Bolter, their relationship has improved. Due to these considerations, we find that the record supports an award of $20,000.00 to Mrs. LeBlanc for loss of consortium.
With regard to the children, we find here too that the jury was manifestly erroneous in failing to make an award for loss of consortium. Both Mr. and Mrs. LeBlanc testified as to how the plaintiff's relationship with the couple's three sons had changed. In particular, LeBlanc was no longer able to participate in sporting activities or even attend their sporting matches as he once had. Furthermore, he had difficulty assisting with their homework due to pain. Christopher LeBlanc, the couple's oldest son, testified that, although he still had a good relationship with his father, they seemed to argue more after the accident. He also related how his father was no longer as involved in his sports activities, even missing his championship soccer game, and how the sons now care for the yard work. It was stipulated between the parties that the other two sons would testify similarly.
We find that the record supports an award of $10,000.00 to each of the three LeBlanc children.

Court Costs
In the final assignment of error, LeBlanc contends that the trial court erred in assigning twenty-five percent of the court costs to him. He maintains this was an abuse of discretion, as Acadian was solely at fault in causing the accident. The plaintiff contends that since he was the prevailing party, and there is no proof that he caused additional costs or expenses to be incurred, there is no behavior which would have justified the imposition of costs. The defendant argues that the apportionment was proper, as the plaintiff's did not prove entitlement to all of the injuries claimed.
La.Code Civ.P. art.1920 provides as follows with regard to court costs:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
*685 In Este', 96-99, p. 14; 676 So.2d at 859, we explained:
It is the general rule that the party cast in judgment is taxed with costs of a proceeding, however, the trial court may assess the costs of a suit in any equitable manner and its assessment of costs can only be reversed by an appellate court upon a showing of an abuse of discretion. La.Code Civ.P. art.1920; Cajun Electric Power Cooperative v. Owens-Corning Fiberglass, 616 So.2d 645 (La.1993); Lynch v. Hanover Insurance Company, 611 So.2d 121 (La.App. 5 Cir.1992), writ denied, 613 So.2d 996 (La.1993). When a prevailing party is taxed with the costs of a proceeding it is because that party, in some way, incurred additional costs pointlessly or engaged in other behavior that justified an assessment of costs again that litigant.
We find that the trial court abused its discretion in assessing twenty-five percent of the court costs to the plaintiff in this matter. Although not in the full amount sought, LeBlanc prevailed at trial proving a causal connection to the medical expenses sought. He was awarded lost wages, lost future earning capacity, loss of benefits, and general damages. Furthermore, there is no indication that he engaged in any behavior otherwise justifying such an assessment. Therefore, we reverse that award and amend the judgment to assess all costs against the defendants.

DECREE
The judgment entered in this matter is amended to reflect increases in the award for past medical expenses to the amount of $219,218.90 with credit given for the amount previously paid by the defendants. Furthermore, the award for loss of employment benefits is increased to $11,138.16 and the award for general damages is increased to $250,000.00. With regard to the claims for loss of consortium, we amend the judgment to reflect an award of $20,000.00 to Elizabeth B. LeBlanc and awards of $10,000.00 each to Christopher Lee LeBlanc, Nicholas Dean LeBlanc, and Benjamin Scott LeBlanc. That portion of the judgment relating to court costs is reversed and all court costs, both related to the proceedings in the trial court, and those associated with this appeal are assigned to the defendants, Acadian Ambulance Service, Inc., Justin Cox, and Insurance Company of North America.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART; AND RENDERED.
DOUCET, C.J., concurs and assigns reasons.
DOUCET, C.J., CONCURRING.
I agree with the majority herein concerning the application of the collateral source rule and the proposal to increase the award for past medical expenses. However, I do not agree with the application of Bloxom v. Bloxom, 512 So.2d 839(La.1987) in this situation. Not only is the Bloxom standard an exceptional standard of review, Bloxom contemplates articulated reasons for judgment, which are not possible with a jury. I would apply a manifest error standard of review. However, I feel that the award made by the jury was an abuse of its discretion, and that the awards as increased by Judge Amy are appropriate. Therefore, I concur in the result.
NOTES
[1] La.Code Evid. art. 607 provides the following with regard to questions of credibility:

A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
[2] While mindful that Bloxom involved a bench trial rather than one heard by a jury, we find the reasoning of that case applicable here. In Bloxom, 512 So.2d at 843, the supreme court observed that deference is owed to a decision if the trier of fact's "path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record...." The absence of an obvious or implied path would appear to be possible notwithstanding that the jury is the trier of fact rather than a judge who issued unclear or incomplete reasons. In the present case, the manifest error standard of review is not available for the entirety of our review for reasons described above. However, as will be seen below, the more deferential standard has been applied where the path of the jury's factual findings can be implied.
[3] The record establishes that after being added to his wife's policy, the plaintiff maintained his own health insurance by paying for COBRA extension. Contrary to the defendants' apparent assertion in brief, Dr. Rice testified that these payments were not included in the $11,138.16 figure. They were, however, included in his calculation for future benefits. We do not address future benefits here.
[4] The following passage from LeBlanc's testimony indicates the speculative nature of any award for lost military pay or military retirement. When LeBlanc's attorney inquired as to why he had not applied for transfer to the USAR Control Group, IRR, he responded as follows:

A. Because at that time my military records and retirement points were still not corrected. We had tried on three (3) separate occasions to get it corrected to reflect my actual time in the military. Once you're transferred to the control group, all those records are sent forward and it's like a ghost town. You can never find all those records. I wanted my retirement points corrected prior to being sent to the control group.
Also, as soon as that document or I'm transferred to the IRR, I have been flagged with a profile. Once a profile is established, you cannot attend any school for the military, do any correspondence you cannot do anything for the military. So, in essence, I was I would have been lack of word dead in the water. I still had intentions of hoping to get better and still get my twenty (20) years for retirement. That's why I did not want to go to the IRR. The door would have been shut on me at that time. I would have lost everything.
Thus, it appears that the possibility existed for other employment with the military, but that LeBlanc did not pursue this avenue for fear of not being able to rectify his retirement situation. Furthermore, although he stated that he had attempted to clarify his records with regard to the number of points amassed, he had been unsuccessful.